Filed 3/7/13  Concerned Dublin Citizens v. City of Dublin CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CONCERNED DUBLIN CITIZENS et al., Plaintiffs and Appellants, v. CITY OF DUBLIN et al., Defendants and Respondents; AVALONBAY COMMUNITIES, INC., Real Party in Interest. | A135790 (Alameda County Super. Ct. No. RG11581959) |

Government Code section 65457[1] provides an exemption from environmental review for a residential development that is consistent with a broader specific plan for which an environmental impact report previously has been certified. This appeal challenges the determination by respondents City of Dublin and the City Council of the City of Dublin (collectively, the city) that the proposed development of a 7.2-acre parcel by real party in interest AvalonBay Communities, Inc. (AvalonBay) within a larger Dublin Transit Village Center development (transit center), for which an environmental impact report was previously prepared and certified, qualifies for that exemption. We find no error in the city's application of the exemption and therefore shall affirm the judgment denying appellants' petition for a writ of mandate.[2]

---

[1] All statutory references are to the Government Code unless otherwise noted.

[2] The city's request for judicial notice of Dublin Municipal Code section 8.28.030(e), which is referenced in appellants' brief but not contained in the record, is granted.

## Factual and Procedural History

The transit center is "a high-density mixed-use, transit and pedestrian-oriented development" adjacent to Bay Area Rapid Transit's East Dublin/Pleasanton Station. As stated in the 2002 plan for the transit center, the objective of the larger project is, among other things, to "1) Construct[] a state-of-the-art, urban-scale, mixed-use employment, residential and retail center based on close accessibility of inter-modal transportation opportunities: rapid transit, bus transit, vehicle access and nonmotorized transportation modes. [¶] 2) Promot[e] a pedestrian-friendly environment within the transit center project where employees, residents and visitors are encouraged to walk or use other non-vehicular modes of transportation. [¶] 3) Increase[] employment opportunities in the community through the development of office, retail and similar employment-generating land uses, including a maximum of 2 million square feet of office space and 70,000 square feet of ancillary retail space. [¶] 4) Provid[e] up to 1, 500 higher density dwelling units for households desiring to live in a more urban setting, near work and public transit opportunities."

In 2002, the city approved the Eastern Dublin Specific Plan for the transit center (the specific plan) and, in compliance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), certified an environmental impact report (EIR) for the specific plan. The specific plan includes a stage 1 development plan that establishes the permitted land uses and development standards for future development projects within the transit center.

The EIR for the specific plan was prepared as a program EIR, pursuant to section 15168 of the CEQA Guidelines.[3] It describes general impacts and mitigation measures for, among other things, the specific plan and the stage 1 development plan. The EIR analyzes the impacts from full build-out of all uses authorized under the specific

---

[3] All references to guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) developed by the Office of Planning and Research and adopted by the California Resources Agency. We note that the specific plan EIR might also be characterized as a master plan EIR pursuant to Guidelines section 15175, which would not significantly affect the analysis of any issue considered in this opinion.

plan and contains a detailed project description, setting forth specific locations for proposed uses, roadways, setback requirements, and other site-specific features. The EIR analyzes environmental impacts in thirteen areas, includes mitigation measures to address potential impacts, and analyzes alternatives to the proposed transit center project.

The EIR anticipates that implementation of the transit center specific plan will require a number of "follow-on actions," including approval of stage 2 development plans and site development review for future projects. The EIR states: "Prior to receiving final approvals for individual development projects within the Dublin Transit Center site allowed by this General Plan/Specific Plan Amendment described in this EIR, applicants must submit Stage 2 Planned Development Rezoning requests to the City of Dublin. Stage 2 Rezoning includes specific information regarding development proposals and land uses. Site Development Review (SDR) applications must also be approved by the City of Dublin, to include precise information regarding building architectural design, use of exterior materials, a specific site layout, landscaping plans, conceptual signs plans and other design details. Other applications may include parcel maps to create individual building lots, consideration of grading and building permits, utility hook-ups by the Dublin San Ramon Services District (DSRSD), granting of encroachment permits by the City of Dublin, and filing of Notices of Intent with the State Water Resources Control Board." The EIR "anticipate[s] that additional environmental review would occur at each of these stages of the project."

Under the stage 1 development plan adopted in 2002, the parcel at issue in this action was designated as site C and was to include a maximum of 405 high density residential dwelling units and up to 25,000 square feet of retail space. In 2007, AvalonBay submitted its first proposal for development of site C. The project as initially proposed consisted of 405 apartment units, 22,895 square feet of ground-floor retail space, a leasing center, fitness center, and two multi-story parking garages. For economic reasons, AvalonBay did not immediately move forward with this proposal. In 2010, AvalonBay submitted a revised proposal that included 486 apartment units, 4,192 square feet of commercial development, the leasing center, fitness center, and two multistory

3

parking garages. After initial review by the city but prior to a vote on the project's approval, AvalonBay withdrew its plan in order to further revise the project.

On March 7, 2011, AvalonBay submitted its revised proposal for the development of site C. The latest plan differs from the prior proposals in that it increases the number of residential units and eliminates the previously proposed retail space. The project now includes 505 apartment units, a leasing center, a fitness center, two parking structures, and on-street parking spaces. The planning commission report prepared on the project explains that while ancillary commercial development is not being proposed at this time, "to maintain the look of commercial development, commercial architecture is being applied to the residential units fronting the central plaza at the south end of the project, at the fitness center located at the northeast corner of the project and for two units facing Iron Horse Parkway just south of the fitness center." At a subsequent planning commission meeting, AvalonBay confirmed that the ground floor units were being developed as residential but "would be able to be returned to retail space in the future." AvalonBay explained that the basic project description removes retail usage from the project because the transit center already has 12,000 square feet of retail space that has not been leased after four years, but that "the units can be converted back to commercial and the two-story look of the area will remain in the event there is an opportunity to return those spaces to a retail component."

As anticipated by the specific plan, AvalonBay sought approval from the city of a stage 2 development plan and a site development review (SDR) permit. AvalonBay also sought an amendment to the stage 1 development plan to reallocate 100 residential units from site A to site C.[4]

---

[4] AvalonBay also sought approval of a "Vesting Tentative Tract Map" (map) so that the apartment units could be converted to condominiums in the future and approval of the standard development agreement. Because AvalonBay was seeking to develop in site C more than the 405 residential units initially authorized by the stage 1 development plan, an amendment to the stage 1 development plan was necessary but no further modification of the stage 1 development plan was required because the plan includes a provision authorizing the City to exceed the dwelling unit limits established for each of the residential use sites if an equal number of residential units are eliminated from other sites within the transit center, as AvalonBay proposed.

With respect to the proposed stage 2 development plan, the planning commission report explains, "Most of the standards and requirements of a Stage 2 Development Plan required by Chapter 8.32.030 B. of the Zoning Ordinance were adopted in 2002 with the Stage 1 Planned Development Zoning for all of Dublin Transit Center. The Stage 1 Planned Development zoning established the permitted, conditionally permitted, and accessory land uses; site areas and proposed densities; maximum number of residential units and non-residential square footages; and a Master Landscaping Plan. [¶] The approved development standards contained in the Stage 1 Development Plan provide for development standards such as building height, number of stories, building setbacks and a parking ratio of 1.5 parking stalls per unit and suggested high-density residential development in 4 or 5 stories either over podium parking or with the units 'wrapped' around the parking structures as is the case with this project and Avalon's first project. [¶] The adopted Planned Development zoning also limits ancillary retail and services to the ground floor frontage along Iron Horse Parkway. The proposed development of Site C complies with the Stage 1 Planned Development Zoning for the Dublin Transit Center as it is compatible with the Dublin Transit Center land use concept to maximize transit opportunities presented by the adjacent Dublin/Pleasanton Bay Area Rapid Transit (BART) Station and will contribute to an accessible and pedestrian-friendly environment in proximity to the BART Station. The Stage 2 Development Plan for Avalon Transit Center, Site C has been designed to be consistent with the Stage 1 standards as proposed to be amended. The proposed Site Development Plan is reflective of the Stage 2 standards in terms of lot area, lot dimensions, lot coverage, type and number of units, location and number of parking spaces, setbacks, architecture, and affordable housing."

With respect to the site design review, the planning commission report analyzes the site plan, architectural design, building elevations, floor/unit plans, landscape plan, access and circulation, parking, streetscape improvements and ancillary retail/commercial space. As to the retail space, the report states "The stage 1 development plan for the Dublin transit center notes that 'ancillary ground floor retail and service uses are strongly encouraged' and 'Up to 70,000 square feet of ground floor retail and service uses could

5

be incorporated into the residential . . . fronting on Iron Horse Parkway as long as the overall densities are not exceeded.' The stage 1 [development plan] allows a maximum of 25,000 square feet of commercial space in the project site. The site C project that was previously reviewed by the planning commission included 4,192 square feet of commercial space. However, the inability to lease the existing retail/commercial space (12,750 sq ft) in Avalon's existing project has prompted the applicant to eliminate the ancillary commercial space from the proposed project on site C. The applicant has not altered the architectural character significantly of the buildings facing the central plaza or Iron Horse Parkway where the retail space was originally located. At the intersection of Campbell Green and Iron Horse the project incorporates a 4,223 square foot fitness center which gives the visual impression of commercial space. Additionally, the conversion of the retail space to residential uses facing Iron Horse Parkway and the central plaza will maintain the commercial architectural look (Attachment 6 )."

Following a hearing on March 22, the planning commission approved the site development review and map and recommended that the city council approve the stage 1 development plan amendment, the stage 2 development plan, and the development agreement. The planning commission found that the project is "exempt from CEQA pursuant to Government Code section 65457 for residential projects that are consistent with a specific plan for which an EIR was certified." Accordingly, the planning commission concluded that "No further environmental review is required." Appellants[5] appealed the decision of the planning commission to the city council.

On May 17, 2011, the city council affirmed the planning commission's approval of the site development review permit and map and, on June 7, 2011, approved the stage 1 development plan amendment, the stage 2 development plan and the development agreement. The city council found that each of these is "exempt from CEQA under Government Code section 65457 . . . as a residential project that is consistent with a specific plan for which an EIR has been certified."

---

[5] Appellants are Concerned Dublin Citizens (an unincorporated group of concerned citizens), Robert Klein (a member of the group), and Carpenters Local Union No. 713.

On June 22, 2011, appellants filed a petition for a writ of mandate challenging the exemption from environmental review. After a hearing, the trial court found that substantial evidence supports the city's finding that the elements of the section 65457 exemption are satisfied and, on April 30, 2012, issued a final statement of decision and entered judgment in favor of the city, denying all relief. Appellants filed a timely notice of appeal.

## DISCUSSION

### 1. Standard of Review

"It is state policy in California that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' [Citations.] In order to implement this policy, CEQA and the guidelines issued by the State Resources Agency [citation] have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112.) The first step "is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity." (*Ibid*.) As part of the preliminary review, the public agency must determine the application of any statutory exemptions that would exempt the proposed project from further review under CEQA. If, as a result of preliminary review, "the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary. The agency may prepare and file a notice of exemption, citing the relevant section of the Guidelines and including a brief 'statement of reasons to support the finding.' " (*Id*. at p. 113.)[6]

In considering a petition for a writ of mandate in a CEQA case, "[o]ur task on appeal is 'the same as the trial court's. [Citation.] Thus, we conduct our review

---

[6] The overview in *Davidson Homes* continues: "If, however, the project does not fall within any exemption, the agency must proceed with the second tier and conduct an initial study. [Citation.] If the initial study reveals that the project will not have a significant environmental effect, the agency must prepare a negative declaration, briefly describing the reasons supporting that determination. [Citation.] Otherwise, the third step in the process is to prepare a full [EIR] on the proposed project." (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th at p. 113.)

7

independent of the trial court's findings." (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602, fn. 3.) The question on appeal "is whether the agency abused its discretion. 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th at p. 113.)

Here, the city concluded that the project is exempt because it satisfies each of the elements of the statutory exception provided by section 65457. Under section 65457, subdivision (a), "Any residential development project, including any subdivision, or any zoning change that is undertaken to implement and is consistent with a specific plan for which an environmental impact report has been certified after January 1, 1980, is exempt from the requirements of Division 13 (commencing with Section 21000) of the Public Resources Code. However, if after adoption of the specific plan, an event as specified in Section 21166 of the Public Resources Code occurs, the exemption provided by this subdivision does not apply unless and until a supplemental environmental impact report for the specific plan is prepared and certified in accordance with the provisions of Division 13 (commencing with Section 21000) of the Public Resources Code."[7] Thus, to qualify for the section 65457 exemption, the project must be for residential development, it must implement and be consistent with a specific plan for which an environmental impact report previously has been certified, and the qualification contained in the final sentence must not apply, i.e., either a supplemental EIR must not be required by Public

---

[7] Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

Resources Code section 21166 or such a supplemental EIR must already have been prepared and certified.

In reviewing the city's decision, we apply a de novo standard of review to questions of statutory interpretation. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1382 ["The scope of an exemption may be analyzed as a question of statutory interpretation and thus subject to independent review"].) "In determining whether an agency's findings concerning the use of a statutory exemption from CEQA may be upheld, we review the administrative record to see that substantial evidence supports each element of the exemption. [Citations.] 'There must be "substantial evidence that the [activity is] within the exempt category of projects." [Citation.] That evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold. [Citation.]' [Citation.] . . . [O]ur application of substantial evidence review in the context of a challenge to an agency's use of a statutory exemption means we determine whether the administrative record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. All conflicts in the evidence are resolved in support of the agency's action and we indulge all reasonable inferences to support the agency's findings, if possible." (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 973.)

Appellants acknowledge that generally the substantial evidence rule applies to a local agency's determination that a project is statutorily exempt from CEQA review. They argue, however, that there is an exception to this general rule when application of the exemption depends on whether the project will have significant environmental impacts. In such cases, appellants contend, the fair argument standard should apply.[8]

---

[8] "The 'fair argument' test is derived from section 21151, which requires an EIR on any project which 'may have a significant effect on the environment.' That section mandates preparation of an EIR in the first instance 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.] If there is substantial

9

Appellants rely on footnote 24 in *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1407, in which the court stated, "We have held that a substantial evidence standard of review applies to an agency's factual finding that a statutory exemption applies. [Citations.] Most statutory exemptions, however, operate regardless of whether the project will have effects on the environment. [Citations.] Thus, '[w]hen reviewing a statutory exemption, the nature and extent of the project's environmental impacts are ordinarily irrelevant.' [Citation.] Therefore, we have at least suggested that where a statutory exemption *does* depend on whether the project will have significant environmental effects . . . , the fair argument standard should govern review of an agency determination that the statutory exemption applies."

We need not decide whether there is merit to this suggestion because the section 65457 exemption does not require a determination of whether the proposed project will have significant environmental effects. The section 65457 exemption, like other statutory exemptions, reflects the Legislature's determination that the interest promoted is "important enough to justify forgoing the benefits of environmental review." (*Napa Valley Wine Train, Inc. v. Public Utilities Com*. (1990) 50 Cal.3d 370, 382, superseded by statute on another ground as stated in Pub. Resources Code, § 21080.04, subd. (b); see also *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 128-129 ["statutory exemptions have an absolute quality not shared by categorical exemptions: a project that falls within a statutory exemption is not subject to CEQA even if it has the potential to significantly affect the environment"].) Under section 65457, a residential development project that is consistent with a specific plan for which an EIR already has been certified ordinarily is statutorily exempt from further CEQA review regardless of possible environmental impacts of the project.

The qualification contained in the final sentence of section 65457 delays application of the exemption "unless and until" further environmental review of the specific plan has taken place if required by Public Resources Code section 21166. If

evidence of such impact, contrary evidence is not adequate to support a decision to dispense with an EIR." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316.)

10

Public Resources Code section 21166 should apply, the exception does not require preparation of an EIR for the proposed residential project; it prohibits application of the exemption "unless and until a supplemental environmental impact report for the *specific plan* is prepared and certified." (§ 65457, italics added.) Thus, insofar as the exemption under section 65457 turns on whether Public Resources Code section 21166 requires updating of the program EIR, we apply the same substantial evidence standard of review that governs review of a determination that a supplemental EIR is not required under section 21166. (See *Abatti v. Imperial Irr. Dist.* (2012) 205 Cal.App.4th 650,675 ["In reviewing an agency's decision not to require additional environmental review 'pursuant to section 21166, courts "are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the [agency's] decision in order to determine whether substantial evidence supports the decision not to require additional review." ' "])

**2. The project is a residential development.**

Although there is no statutory definition of the term "residential development" for purposes of this exemption, the trial court concluded, and the parties agree for purposes of this appeal, that a residential development project under section 65457 is a project that contains "100% residential units or the usual incidents of residential units, such as yards, parks or other uses authorized as permitted uses within a residential zoning district." Appellants acknowledge that the development as presently proposed includes only residential units, as so defined, but contend that the project is nonetheless a mixed-use development because the specific plan, stage 1 development plan, stage 2 development plan and the development agreement authorize up to 25,000 square feet of commercial usage in site C. Hence, appellants argue, because AvalonBay "retains the option to convert residential units to 25.000 SF of retail space, [the project] is not limited to a residential development project and falls outside of Section 65457's exemption." The trial court rejected this argument because "[t]he city code and approval process for this project makes it clear that any future commercial use on the project site will require

11

further discretionary review in the form of an amendment to the site development review approved for the project." We agree.

The only project that has been approved by the city for site C is development of 505 residential units and ancillary features.[9] As the court noted, conversion of some of the approved residential units to commercial use, if later proposed, would be subject to site development review under Dublin Municipal Code section 8.104.040. This section specifies the proper body to process site development review of a lengthy list of common improvements. The conversion of residential to commercial use is not listed, but subsection H of the ordinance provides that "All other improvements to structures or a site, which are not otherwise mentioned in this Chapter, shall be subject to a Site Development Review Waiver or Site Development Review, as determined by the Community Development Director." Appellants contend that no site development review of such a conversion would be required because of subsection E of section 8.104.040, which exempts "interior alterations" from site development review. However, this exemption applies only to "[i]nterior alterations that do not result in . . . a change in the permitted use of the structure or the modification of the existing configurations and uses

---

[9] Contrary to counsel's suggestion at oral argument, the site development review permit does not include or approve any commercial use as part of the approved project. City council resolution No. 60-11 approving the site development review incorporates the following recital as part of the resolution: "WHEREAS, the Applicant applied for a PD-Stage 1 Development Plan amendment and Stage 2 Development Plan in accordance with Dublin Zoning Ordinance, Section 8.32, and for Site Development Review, Vesting Tentative Tract Map 7929 and a Development Agreement for 505 residential units on Site C of the Dublin Transit Center. The application for Site Development Review and Vesting Tentative Tract Map are collectively referred to herein as the 'Project.' " In finding that the project is exempt from CEQA, the resolution repeats that "[t]he Project is a residential project because it consists of 505 residential units and ancillary parking and fitness center uses." The city council resolution also incorporates the findings and conditions of approval under planning commission resolution No. 11-09, which defines the project as "505 residential units on Site C of Dublin Transit Center" and includes the finding that "[t]he proposed site design for the development of the Dublin Station project, as conditioned, is consistent with chapter 8.104 of the Dublin Zoning Ordinance, complies with the policies of the General Plan, the Eastern Dublin Specific Plan, the Stage 1 Planned Development zoning as amended, the Stage 2 Development Plan, and with all other requirements of the Dublin Zoning Ordinance in that it will create housing opportunities; and provide additional landscape amenities and areas to congregate at the Transit Center."

12

of each room." The "permitted use" refers to the use approved in the site development review permit—in this case embodied in city council resolution No. 60-11—and does not include other uses that may be permissible under the applicable zoning ordinance but are not approved by the site development review permit. The conversion of residential living space to commercial use would clearly fall outside the plain language of this exemption.

Contrary to appellants' additional argument, the fact that the property is zoned for mixed uses does not convert the otherwise purely residential project into a mixed-use project. *Wesley Investment Co. v. County of Alameda* (1984) 151 Cal.App.3d 672 is instructive in this regard. In that case, the plaintiff was denied a permit to establish a retail store even though that use was permitted under the applicable zoning ordinance. The denial was based on a site development review ordinance that called for an exercise of discretion to " 'promote orderly, attractive, and harmonious development . . . by preventing establishment of uses . . . which are not properly related to their sites, surroundings . . . or their environmental setting.' " (*Id.* at p. 676.) The court held that compliance with the zoning laws did not guarantee entitlement to a permit. "The [zoning] ordinances do not provide for an unbridled right to erect a retail store in a C-1 zone. Rather, the listing of permitted uses in Ordinance Code section 8-48.1 is qualified by the provision in section 8-48.4 subjecting certain projects to site development review. . . . The fact that the site in question is in a zone where a retail store may be lawfully maintained does not diminish the county's power to determine that a particular development is not suitable for that location." (*Id*. at p. 678.) Commercial use within the transit center is no different. AvalonBay is not automatically entitled to develop commercial property simply because such use would comply with zoning requirements. Rather, the specific plan anticipates that before any use of the property is approved, there will be compliance with the site development review process, which includes compliance with applicable environmental review. Hence, approval of the project as presently proposed does not constitute approval of commercial usage within site C. Therefore, the project is properly considered residential development within the meaning of section 65457.

13

**3. The project is consistent with the transit center specific plan.**

Appellants contend that in two respects the project is inconsistent with the transit center specific plan for which the EIR was certified in 2002. First, they contend that because the specific plan is for mixed use, the project must also be a mixed-use plan. They argue, "[T]he transit center specific plan, the EIR for which the city relies upon, is a mixed-use project and not a residential development. Area C, the site of AvalonBay, is permitted to include up to 25,000 SF of retail space. Overall, the transit center anticipates a maximum of 70,000 SF of ground-floor retail space, including specifically along Iron Horse Parkway on the eastern side of area C. The inclusion of ground-floor retail is integral to the transit center's goal of creating a human-scale street width and interesting pedestrian environment. Because AvalonBay must be consistent with that specific plan, it is a mixed-use project, not a residential project. [Citation.] If the city in fact deleted the retail uses from area C and AvalonBay — 35 percent of the transit center's retail uses — then the project would not be consistent with the mixed-use project specified in the specific plan. The city cannot have it both ways – either AvalonBay is consistent with the specific plan and, hence, a mixed-use project, or it is inconsistent with the specific plan because it has deleted the retail uses from area C (in which case section 65457(a) would also not be available)." We disagree.

While the transit center is designed to combine residential and commercial use in a sustainable, transit friendly environment, commercial development in site C is not required by the specific plan. The transit center retains its mixed-use character whether or not each of the several sites within the center includes mixed usage. Moreover, as noted by the city, the specific plan states only that retail uses are "encouraged" — not required. The planned development zoning, which applies to the project site, similarly states only that ancillary retail uses are "encouraged." Thus, the absence of retail space does not render the project inconsistent with the specific plan.

Next, appellants argue that "[b]ecause the city elected to prepare a program level EIR in 2002, it cannot now change and exempt itself from the tiered EIRs that must necessarily follow." Appellants argument finds no support under CEQA or the EIR that

14

was certified in 2002. Guideline 15168 explains that "[a] program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guideline 15168, subd. (a).)[10] Subdivision (c) of Guideline 15168 addresses the use of a program EIR in evaluating later activities. The subdivision states that "[s]ubsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared. [¶] (1) If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration. [¶] (2) *If the agency finds that . . . no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required.*" (Italics added.) Subdivision (c)(5) advises, "A program EIR will be most helpful in dealing with subsequent activities if it deals with the effects of the program as specifically and comprehensively as possible. With a good and detailed analysis of the program, *many subsequent activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required.*" (Italics added.) Contrary to appellants' argument, nothing in section 15168 or any other provision mandates a particular level of environmental review

---

[10] Subdivision (b) of this guideline lists the advantages of a program EIR, including that a program EIR can "(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the Lead Agency to consider broad policy alternatives and programwide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, and [¶] (5) Allow reduction in paperwork."

15

in evaluating later projects within the scope of a certified program EIR. While in some cases it will be necessary to prepare a negative declaration and in others to prepare a full environmental impact report, in others, the analysis will be completed by determining that the project is exempt from further CEQA analysis. This is the first of the "three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidson Homes, supra,* 54 Cal.App.4th at pp. 112-113.)

Likewise, the terms of the EIR do not prescribe the necessary scope of environmental review for subsequent projects within the transit center. As noted above, the EIR acknowledges that "[i]mplementation of the transit center will require a number of follow-on actions" and that "it is anticipated that additional environmental review would occur at each of these stages of the project." [11] The EIR does not, however, require a specific level of environmental review. As the trial court noted, "The city's consideration of whether the Govt. Code 65457 exemption applies is itself an environmental review, so the city has been consistent with the letter of the law. By announcing that the city intended to rely on the Govt Code 65457 exemption and permitting public comment on the use of that exemption, the city has been consistent with the spirit of the law."

---

[11] Appellants cite two additional passages in the EIR dealing with subsequent environmental review. In one passage, the EIR reads, "The entitlements currently sought are intended to provide a general framework for the comprehensive development of the area as a transit village. Precise site development plans have not yet been prepared for individual properties, but will be included in subsequent submittals to the City of Dublin. Subsequent submittals will deal with such issues as project-specific land uses, site layouts, parking, building architecture, landscaping and similar items. Future environmental reviews will be completed on specific development applications to ensure compliance with this Program EIR and CEQA." In a second passage, the EIR reads, "Although not specifically addressed in this Program EIR, the following actions are foreseen as future actions to be considered as part of the overall Dublin Transit Center project subject to subsequent applications and environmental reviews: Stage 2 Planned Development rezoning, Site Development Review applications, consideration of grading and building permits, utility hook-ups by the Dublin San Ramon Services District (DSRSD), granting of encroachment permits by the City of Dublin, and filing of Notices of Intent with the State Water Resources Control Board." Neither of these statements specifies the necessary level of review or precludes application of a statutory exemption.

**4. The qualification to the section 65457 exemption does not apply.**

As noted above, the section 65457 exemption does not apply if, subsequent to certification of the program EIR, "an event as specified in Section 21166 of the Public Resources Code" has occurred "unless and until a supplemental environmental impact report for the specific plan is prepared and certified." Public Resources Code section 21166 specifies three events that trigger the need for preparation of a supplemental environmental impact report. These events are: "(a) Substantial changes . . . in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes . . . with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [and] [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Public Resources Code, § 21166; see also Guidelines, § 15162.) Thus, the qualification to the section 65457 exemption thus turns on whether, subsequent to the certification of the EIR, circumstances have changed to the extent that reliance on the EIR is unwarranted. (See *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 ["section 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired [citation], and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process"].)

In this case, the city determined that there are no circumstances warranting additional environmental review of the transit center project. Appellants challenge this determination in two respects. First, appellants argue that the increase in residential units in site C constitutes a significant change to the specific plan that requires further environmental review. The city contends the reallocation of 100 units from site A to site C cannot be considered a significant change to specific plan. We cannot disagree. As the city points out, reallocation of residential units within the transit center is expressly authorized by the plan. As reflected in the table on proposed land uses for the Dublin Transit Center contained in the specific plan, sites A, B, and C are all zoned high density

17

residential. The specific plan allocates 405 residential units to site C, 565 units to site B, and 530 units to site A for a maximum of 1,500 residential units. However, note 4 to the table states, "Maximum square footage and maximum units per site can be exceeded, as long as the total square footage or units is not." The EIR analyzes environmental impacts based on the maximum residential units in the transit center. Shifting 100 units to a different location within the transit center is not a significant change. Site C to which the units were reassigned is adjacent to site A, in which the number of residential units was reduced. Importantly, the total number of residential units was not increased. The city thus was entitled to determine that this change does not require preparation of a supplemental environmental impact report for the specific plan.

Appellant also argues that supplemental environmental review is necessary under section 21166, subdivision (c) because significant and new information regarding greenhouse gas (GHG) emissions has come to light since the EIR was certified in 2002. Although the EIR does not analyze environmental impacts from GHGs, appellants do not question the sufficiency of the analysis of air quality impacts in the EIR and they concede that the city "applied the then-available BAAQMD [Bay Area Air Quality Management District] thresholds for ROGs [reactive organic gases] and NOx [nitrous oxide] in the 2002 EIR for the overall transit center and determin[ed] that it would have significant and unavoidable impacts from its releases of those pollutants."[12] Appellants assert that in 2010, BAAQMD adopted new thresholds for establishing significant environmental

_____

[12] The EIR acknowledges that "According to the Bay Area Air Quality Management District, air pollution potential is high in the Livermore-Amador Valley especially for ozone in the summer and fall. High temperatures increase the potential for ozone, and the valley not only traps locally generated pollutants but can be the receptor of ozone and ozone precursors from upwind portions of the greater Bay Area. Transport of pollutants also occurs between the Livermore Valley and the San Joaquin Valley to the east. [¶] During the winter, the sheltering effect of terrain and its inland location results in frequent surface-based inversions. Under these conditions pollutants such as carbon monoxide from automobiles and particulate matter generated by fireplaces and agricultural burning can become concentrated." The EIR concludes that even with feasible mitigation, the transit center will have significant and unavoidable impacts on cumulative regional air quality.

impacts from GHG emissions and they contend that the new thresholds require additional environmental analysis.

The premise for this argument is highly questionable. In March 2012, the Alameda County Superior Court found that BAAQMD failed to comply with CEQA in adopting the new thresholds and set them aside pending further environmental review. (*CBIA v. BAAQMD* (Super. Ct. Alameda County, 2012, No. RG10-548693).) Pending appeal, BAAQMD "is no longer recommending that the Thresholds be used as a generally applicable measure of a project's significant air quality impacts." (<http://www.baaqmd.gov/Divisions/Planning-and-Research/CEQA-GUIDELINES/Updated-CEQA-Guidelines.aspx.> [as of March 7, 2013].) Moreover, the suspended guidelines, even if effective, expressly have no retroactive application: "It is the Air District's policy that the adopted thresholds apply to projects for which a notice of preparation is published, or environmental analysis begins, on or after the applicable effective date. The adopted CEQA thresholds . . . are effective June 2, 2010."

The trial court rejected appellants' argument on the ground that substantial evidence supports the city's finding that, without regard to the effectiveness of the new thresholds, they do not constitute "new information" requiring additional environmental review under Public Resources Code section 21166, subdivision (c). As the trial court found, "[t]he potential environmental impacts of [GHGs] were known or could have been known at the time the 2002 plan EIR was certified." The court relied on a planning commission staff report that states, "In 2002, information about the potential impacts of GHGs was widely known. The United Nations Framework Convention on Climate Change was established in 1992. The regulation of greenhouse gas emissions to reduce climate change impacts was extensively debated and analyzed throughout the early 1990s. The studies and analyses of this issue resulted in the adoption of the Kyoto Protocol in 1997. In the early and mid 2000s, GHGs and climate change were extensively discussed and analyzed in California. In 2000, SB 1771 established the California Climate Action Registry for the recordation of greenhouse gas emissions to provide information about potential environmental impacts. Therefore, the impact of greenhouse

19

gases on climate change was known at the time of the certification of the EIR in November 2002." The court also relied on *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 532, in which the court upheld a local agency's determination that "new information" about GHG emissions did not require supplemental environmental review under Public Resources Code section 21166. Among the reasons for this conclusion was that "information on the effect of greenhouse gas emissions on climate was known long before the City approved the 1994 FEIR." (*Id.* at p. 531.)

Appellants argue that *Citizens for Responsible Equitable Environmental Development* is distinguishable because the petitioners there "limit[ed] themselves to generalized assertions that global warming was a problem" while here the appellants rely on the issuance of new threshold guidelines which could not have been known in 2002. However, the adoption of guidelines for analyzing and evaluating the significance of data does not constitute new information if the underlying information was otherwise known or should have been known at the time the EIR was certified. *Fort Mojave Indian Tribe v. California Department of Health Services* (1995) 38 Cal.App.4th 1574, cited by the trial court, illustrates this point. In that case, the court held that a new regulation designating critical habitat for an endangered species, the tortoise, was not "significant new information" for purposes of Public Resources Code section 21166. (*Id.* at pp. 1605-1606.) As the court stated, "[H]owever legally characterized, the habitat would be affected the same as before. And the environmental review and mitigation measures that had already been completed focused on the real effects of the project not just on 'the tortoise,' but on its habitat (previously termed 'crucial'), which is exactly how the project would impact on the species." (*Id.* at p. 1605.) Thus, the new regulation did not constitute new information requiring a supplemental environmental impact report.

It is true that the relevant impacts had been analyzed in the initial environmental impact report in *Fort Mojave Indian Tribe* and here the impact of GHG emissions was not analyzed in the program EIR. Nonetheless, the impacts of the project on air quality were considered in the EIR and substantial evidence supports the city's finding that the

potential effects of GHGs were known and could have been addressed in conjunction with the certification of the EIR in 2002. Therefore, the city properly concluded that the issuance of new threshold guidelines was not new information that requires the preparation of a supplemental environmental report under Public Resources Code section 21166.

## 5. Conclusion

As did the trial court, we conclude that substantial evidence supports the city's determination that the proposed development of site C of the transit center is a residential development exempt from further environmental review under section 65457. The petition for a writ of mandate therefore was properly denied.

**Disposition**

The judgment is affirmed. Respondents and real party in interest shall recover their costs on appeal.


_____
Pollak, J.


We concur:


_____
McGuiness, P. J.


_____
Jenkins, J.