Filed 12/29/21; Certified for Publication 1/25/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITIZENS' COMMITTEE TO COMPLETE THE REFUGE et al., <br><br>    Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF NEWARK et al., <br><br>    Defendants and Respondents; <br><br><br> SI XVII, LLC, et al., <br><br>    Real Parties in Interest and Respondents. | A162045 <br><br> (Alameda County Super. Ct. No. RG19046938) |

Citizens' Committee to Complete the Refuge (CCCR) and Center for Biological Diversity appeal from the denial of their petition for writ of mandate under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA).[1] Plaintiffs argue the City of Newark (City) violated CEQA when it approved a housing development project by relying on the environmental impact report (EIR) from its approval of a specific

---

[1] Undesignated statutory citations are to the Public Resources Code.

1

plan without conducting further environmental review. We conclude the City's project was exempt from further CEQA review under Government Code section 65457 because it implemented and was consistent with the specific plan, and substantial evidence supports the City's conclusion that no project changes, changed circumstances, or new information required additional analysis. We also determine that the City's deferral of analysis of potential flood control projects to address sea level rise in the latter half of this century was proper. We will therefore affirm.

## BACKGROUND

In the early 1990s, the City's general plan allowed for low-density housing, a business park, a golf course, and other recreational facilities and uses in the City's Areas 3 and 4, which are located next to San Francisco Bay.[2] The general plan acknowledged that development in Area 4 would have impacts on wetlands containing the salt marsh harvest mouse (harvest mouse), which is an endangered species. The general plan stated that development in Area 4 would require a specific plan.

In 2010, the City certified an environmental impact report (EIR) on the specific plan for Areas 3 and 4, approved the specific

_____

[2] We grant appellants' unopposed request for judicial notice of portions of the City's 1992 and 2013 General Plans. (Evid. Code, § 452, subds. (b) & (c); *The Park at Cross Creek, LLC v. City of Malibu* (2017) 12 Cal.App.5th 1196, 1200, fn. 2.) We deny as unnecessary their requests for judicial notice of a 2007 report by the Intergovernmental Panel on Climate Change and the appearance and size of several plants mentioned in the administrative record.

plan for Areas 3 and 4, and entered into a development agreement for the specific plan. The specific plan allowed development of up to 1,260 residential units as well as a golf course and related facilities. In Area 4, the plan allowed development of up to 316 acres spread across subareas B (about 125 acres), C (about 90 acres), and D (about 100 acres). Subarea B could contain residential uses, subarea C could contain residential uses and/or recreational uses such as the golf course, and subarea D could contain only recreational uses such as the golf course.

CCCR challenged the specific plan under CEQA, contending the EIR was inadequate. The trial court in that case identified several deficiencies in the EIR, including that the EIR failed to make clear in what respects it was intended to be a program-level or project-level document. In response, the City prepared a recirculated EIR (REIR).

As relevant here, the REIR remedied the deficiency the trial court had identified by stating that it was providing a program-level analysis of environmental impacts of the development of housing and a golf course in Area 4. The final location and design of the housing development and golf course in Area 4 was not yet known. The REIR's analysis of environmental impacts with respect to these elements was therefore "based on the potential environmental impacts of the maximum development permitted by the Specific Plan," meaning the construction of all 1,260 residential units in Areas 3 and 4, the development of all 316 acres in Area 4, and the filling of all 86

3

acres of wetlands in subareas B, C, and D in Area 4, even though the development might ultimately have a smaller footprint. The REIR further stated that the City would proceed under CEQA Guidelines[3] section 15168 when it received a specific development proposal for Area 4 and would use a checklist or initial study to determine whether the environmental review for the specific development approvals would consist of an exemption, addendum, tiered negative declaration, or full subsequent or supplemental EIR. But the REIR also quoted the statement in CEQA Guidelines section 15168, subdivision (c)(5) that, with an adequately detailed analysis in a program EIR, "many subsequent activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required."

The REIR found the specific plan could have significant impacts due to the destruction of harvest mouse habitat from the filling of wetlands, the placement of houses next to that habitat, and predation by cats, rats, and raccoons. The REIR called for avoiding these impacts where feasible and mitigating the impacts where avoidance was infeasible.

The REIR discussed the impacts of climate change and sea level rise, noting that by 2100 the Bay level could rise by as much as 5.5 feet and that this rise could occur at an accelerated rate. The REIR stated that fill would be used to raise the elevation of the housing units in Area 4 to approximately 10 to 14.5 feet

---

[3] References to CEQA Guidelines are to California Code of Regulations, title 14, section 15000 et seq.

4

above mean sea level, and the REIR found these elevations would protect the housing units against flooding from rising sea levels until 2100 in all but the most extreme scenario. The REIR noted that because of the uncertainty in projections for sea level rise, it was not clear that using additional fill to raise the residential sites further to provide more protection against flooding in an extreme scenario would be better than relying on a regional adaptive strategy, such as levees or floodwalls.

In March 2015, the City certified the final REIR and re-adopted the 2010 specific plan. Later that year, the City executed a development agreement with the predecessor in interest to SI XVIII, LLC and Arques Investment Company, LLC (collectively, "applicants"), who are the real parties in interest in this proceeding.

In 2016, the City approved a subdivision map for the development of 386 housing units in Area 3.

In 2019, the applicants submitted a proposed subdivision map for approval of 469 residential lots in subareas B and C of Area 4, even though there remained 874 units of the 1,260 units authorized by the specific plan. The subdivision map proposed no development outside subareas B and C and omitted the golf course. Instead, the development agreement proposed to deed much of subarea D to the City.

To determine whether the REIR sufficiently addressed the environmental impacts of the proposed subdivision map, the City prepared a checklist comparing the REIR's analysis of the impacts of the specific plan with the impacts of the subdivision

5

map.  The checklist included supporting materials such as plans, letters, expert memos, and technical reports, including an updated analysis of the effects of sea level rise.  The checklist concluded the construction of 469 units as proposed in the subdivision map would be consistent with the specific plan, and there were no changed circumstances or new information that might trigger the need for additional environmental review.  The City posted the checklist for public comment and responded to those comments.  The City then approved the subdivision map based on the analysis in the checklist.

Plaintiffs challenged the map and checklist via a petition for writ of mandate and complaint for injunctive relief.  The trial court denied appellants' writ petition, concluding the administrative record contained substantial evidence to support the City's determination that further environmental review after the REIR was not necessary.

## DISCUSSION

## I. Relevant legal principles and standard of review

Section 21151, subdivision (a) states, "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an [EIR] on any project that they intend to carry out or approve which may have a significant effect on the environment."  The EIR "provides public officials and the general public with details about a proposed project's consequences.  The EIR also lists the ways to potentially minimize any significant environmental effects, and presents alternatives to the project." (*California Building Industry Assn. v. Bay Area Air Quality*

6

*Management Dist.* (2015) 62 Cal.4th 369, 383 (*Building Industry Assn.*).)

"Unlike '[p]roject EIR[s],' which 'examine[ ] the environmental impacts of a specific development project' (CEQA Guidelines, § 15161), the CEQA provisions governing tiered EIRs 'permit[ ] the environmental analysis for long-term, multipart projects to be "tiered," so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved.' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 959 (*Friends*).)

Government Code section 65457 provides an exemption from CEQA for housing development proposals that follow a city's specific plan. Subdivision (a) of that statute states, in pertinent part, "Any residential development project, including any subdivision, or any zoning change that is undertaken to implement and is consistent with a specific plan for which an environmental impact report has been certified after January 1, 1980, is exempt from the requirements of [CEQA]. However, if after adoption of the specific plan, an event as specified in Section 21166 . . . occurs, the exemption provided by this subdivision does not apply unless and until a supplemental environmental impact report for the specific plan is prepared and certified in accordance with the provisions of [CEQA]." (Gov. Code, § 65457, subd. (a).)

Section 21166 provides that after an agency prepares an EIR for a project, "no subsequent or supplemental [EIR] shall be

7

required . . . unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the [EIR]. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166, subds. (a)–(c).) " 'The purpose behind the requirement of a subsequent or supplemental EIR or negative declaration is to explore environmental impacts not considered in the original environmental document. . . . The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis. Only changed circumstances . . . are at issue.' " (*Friends*, *supra*, 1 Cal.5th at p. 949.)

"Thus, to qualify for the [Government Code] section 65457 exemption, the project must be for residential development, it must implement and be consistent with a specific plan for which an [EIR] previously has been certified, and the qualification contained in the final sentence must not apply, i.e., either a supplemental EIR must not be required by Public Resources Code section 21166 or such a supplemental EIR must already have been prepared and certified." (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1310–1311 (*Dublin*).) Government Code section 65457 exempts such a project "from

8

further CEQA review regardless of possible environmental impacts of the project." (*Id.* at p. 1312.)[4]

"In considering a petition for a writ of mandate in a CEQA case, '[o]ur task on appeal is "the same as the trial court's." [Citation.] Thus, we conduct our review independent of the trial court's findings.' [Citation.] The question on appeal 'is whether the agency abused its discretion. "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." ' " (*Dublin, supra,* 214 Cal.App.4th at p. 1310.)

We review questions of statutory interpretation de novo and review for substantial evidence the City's determination that the section 21166 criteria were not met. (*Dublin, supra,* 214 Cal.App.4th at p. 1311.) For the purposes of our substantial evidence review, " '[w]e resolve reasonable doubts in favor of the administrative decision. [Citation.] "We do not judge the wisdom of the agency's action in approving the [p]roject or pass upon the correctness of the EIR's environmental conclusions. [Citations.] Our function is simply to determine whether the agency followed

---

[4] Both parties contend that the standard for application of the Government Code section 65457 exemption is similar to standard for CEQA review of projects under tiered EIRs, discussed at *Friends, supra,* 1 Cal.5th at pages 959–960. However, as *Friends* noted, review of tiered projects is " 'more searching' " than the standard under section 21166. (*Id.* at p. 960.) Because we conclude that Government Code section 65457 exempts the subdivision map from CEQA review, the general standard for review of tiered projects does not apply here.

9

proper procedures and whether there is substantial evidence supporting the agency's determination . . . ." ' " (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1058.) "A party challenging an agency's decision under section 21166 has the burden to demonstrate that the agency's decision is not supported by substantial evidence and is therefore improper." (*Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1247.)

Plaintiffs do not dispute that the subdivision map constitutes a residential development project or that the project implements and is consistent with the City's specific plan. We therefore confine our analysis under Government Code section 65457 to the question of whether project changes, changed circumstances, or new information trigger the section 21166 exception to the exemption. We also consider appellants' separate argument that the City failed to adequately study certain measures it may adopt to respond to rising sea levels in the second half of this century.

## II. Changes to the project

Plaintiffs' first argument focuses on three aspects of the subdivision map that they contend are significantly different from the specific plan the REIR analyzed. First, the subdivision map proposes to fill and elevate only the upland portions of subareas B and C and not the wetlands in those subareas. Second, the subdivision map does not include a golf course, even though the specific plan had allowed for a golf course in subarea C or D. Third, the filled and raised portions of subareas B and C

10

to be developed will be directly next to the wetlands and the western banks of those elevated areas will be armored with riprap.

Plaintiffs contend these three changes will have new, significant impacts on the harvest mouse. According to appellants, the subdivision map's occupation of all of the upland areas in subareas B and C with housing instead of the golf course will deprive the harvest mouse of escape habitat, also known as refugia. The harvest mouse needs escape habitat like the uplands so that when the wetlands where the harvest mouse normally lives are inundated with periodic flooding, the mouse can temporarily flee to higher ground. In appellants' view, the proximity of the housing development to the wetlands where the harvest mouse lives, together with the riprap armoring the western sides of the filled and raised housing development, exacerbates the effects of the specific plan on the harvest mouse by allowing rats, cats, and raccoons to prey on the harvest mouse.[5]

Substantial evidence supports the City's conclusion that none of these changes will significantly increase the impacts on the harvest mouse beyond what the REIR addressed. The specific plan envisioned the complete development of all of subareas B, C, and D. In its description of the specific plan, the

---

[5] Plaintiffs raised other arguments in the trial court, including the assertion that changes to the project would exacerbate flooding inland from the project. Plaintiffs renewed that argument in their opening brief but abandoned it in their reply, so we do not discuss it.

11

REIR stated, "The Specific Plan land use plan for Area 4 includes up to 316 acres of potential development," with 316 acres equaling the total land contained in subareas B, C, and D. By contrast, the subdivision map will not develop subarea D at all (except for a multi-use trail) and will develop only 96.5 acres of the approximately 148.7 upland acres in subareas B and C. The changes the subdivision map makes from the uses envisioned in the specific plan thus will result in the development of fewer total acres and fewer upland acres. The subdivision map also provides for fewer residential units than the specific plan allowed.

In its discussion of biological resource impacts, the REIR acknowledged that it was "possible that only a portion of the potential development areas in Area 4 will actually be developed," and indicated that "any actual development will require further entitlement processing and environmental review." Plaintiffs rely on passages like this in the REIR to argue that the City could not rely on the REIR and instead was required to analyze the impacts from the specific acres developed in the subdivision map. Crucially, however, because the REIR could not say which land would be developed, it assumed the entire area was to be developed when it analyzed the impacts of the specific plan on biological resources like the harvest mouse. As the REIR stated, "For the purposes of this analysis of the Specific Plan, however, it was assumed that the entire development areas in Area 4 (Sub-Areas B, C, and D) would be developed and impacted." Elsewhere, it said that because "the specific location and number of residences, and location and type

12

of recreation facility in Area 4 are only conceptually known," the EIR's analysis of those elements was programmatic and "based on the potential environmental impacts of the maximum development permitted by the Specific Plan."  Because the REIR claimed it analyzed the impact of developing all of subareas B, C, and D, the subdivision map's development of only a portion of subareas B and C suggests that it will have less of an impact on the environment than the REIR examined.  (*Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 802–806 [assuming prior EIR was a program EIR, substantial evidence supported city's choice not to prepare new EIR for airport project because updated information showed fewer flights with quieter aircraft than previously projected].)

The mere fact that the REIR anticipated some additional review but the City determined the subdivision map had no additional impacts warranting review is not improper or even remarkable.  The City's preparation of the checklist and determination that the Government Code section 65457 exemption applies constitute environmental review, so the City acted consistently both with the law and with the statements in the REIR.  (*Dublin, supra*, 214 Cal.App.4th at p. 1317.)  And as *Dublin* explained at page 1316, while in some cases involving program EIRs and tiered review it will be necessary to prepare a negative declaration or a full EIR, "in others, the analysis will be completed by determining that the project is exempt from further CEQA analysis."  The rule is similar even in the context of tiered review under a program EIR, which involves more stringent

13

review standards than under section 21166 and Government Code section 65457.  (*Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 615 ["a program EIR may serve as the EIR for a subsequently proposed project to the extent it contemplates and adequately analyzes the potential environmental impacts of the project"]; *Friends*, *supra*, 1 Cal.5th at p. 960.)

A closer examination of appellants' arguments confirms that substantial evidence supports the City's conclusion that the subdivision map was exempt from further review.  First, concerning escape habitat for the harvest mouse, the specific plan recognized that uplands next to tidal marsh provide important escape habitat.  The REIR stated that there were 270 acres of these uplands in Areas 3 and 4 currently being used for agriculture and that grading and construction could destroy up to 154.6 acres of them in Area 4.  CCCR itself complained in a comment on the draft REIR that the specific plan would eliminate most of the uplands in subareas B, C, and D, either through development or conversion into wetlands as mitigation for filling existing wetlands, and that this would deprive the harvest mouse of escape habitat.  The REIR found the impact of the loss of these upland habitat would be less than significant because the uplands were regularly used for agriculture and did not provide high quality transitional habitat.  This indicates the REIR already addressed the loss of upland escape habitat, so the subdivision map's impact on such habitat is not new.  The

14

subdivision map's change of developing only 96.5 acres of the uplands means the subdivision map will eliminate less upland escape habitat, not more.

Second, regarding the elimination of the golf course, appellants assert that the golf course would have provided escape habitat for the harvest mouse because the development of the golf course would not have changed the elevation of the undeveloped land. They conclude from this that the subdivision map's abandonment of the golf course eliminates escape habitat. However, the REIR's finding of no significant impact from the development of the uplands in Area 4 did not depend on the golf course continuing to provide upland habitat in subarea C or D. Rather, the City discounted the quality of the upland habitat being eliminated for escape habitat because it is regularly disced and ripped for agriculture. Plaintiffs disagree with this conclusion, which the City repeated in a response to their comment on the checklist. But appellants do not argue the value of the upland habitat changed after the REIR was prepared or cite any evidence to show such a change.[6] If appellants believed the uplands had more value as habitat than the City recognized, they should have raised that challenge to the REIR. (*Friends*,

_____

[6] At oral argument, appellants pointed to a doctoral thesis published in 2019 that they claim provided new information that regularly disced agricultural land is suitable habitat for the harvest mouse. The information in the thesis was not new in 2019. The thesis's author made the same point in a 2014 presentation at a scientific conference. CCCR itself cited this presentation in a comment on the checklist and provided a web link to a copy of the presentation.

*supra*, 1 Cal.5th at p. 949 [" 'The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis. Only changed circumstances . . . are at issue' "]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130 [conclusive presumption under section 21167.2 that a certified and unchallenged EIR is valid "acts to preclude reopening of the CEQA process even if the initial EIR is discovered to have been fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences"].)

Moreover, the subdivision map's elimination of the golf course came together with its abandonment of any development of subarea D, with one minor exception, and the deeding of much of subarea D to the City.  Thus, as compared to the specific plan, uplands in subarea D will be less developed and thus will continue to provide the harvest mouse whatever escape habitat they do currently.  Plaintiffs respond that one portion of subarea D is currently used by an auto dismantler, so leaving that area undeveloped will mean it will be worse than developing the golf course.  But even if the auto dismantler's continued operation in subarea D prevents some of subarea D from serving as escape habitat, the rest of subarea D may still do so, so the subdivision map's impact on uplands is comparable or lower than the specific plan.  Plaintiffs also claim there is no guarantee that the portion of subarea D deeded to the City will never be developed.  Since the subdivision map does not propose to develop any acreage in subarea D, the City cannot be faulted for failing to analyze a

16

development that is not currently proposed. If and when the City develops subarea D in any fashion, such development will need to comply with CEQA.

Third, regarding the impacts on harvest mouse habitation through adjacent development, appellants admit that the REIR disclosed these indirect impacts. Because the subdivision map will develop fewer acres than the specific plan, in total the impacts on the harvest mouse will be reduced. Moreover, the REIR found the indirect impacts could be mitigated, declaring, "Habitat for these species that is indirectly impacted due to proximity to residential and golf course development (i.e., habitat that is not directly filled but that is located within 100 feet of direct impact areas) will be mitigated at a 2:1 ratio by on-site habitat restoration." Plaintiffs point out that the subdivision map will avoid having any direct impacts on harvest mouse habitat because it will avoid filling wetlands. They therefore read this mitigation measure as meaning no indirect impacts will be mitigated. This reads the REIR too narrowly. The REIR plainly admits the harvest mouse habitat will be indirectly impacted by adjacent residential development, regardless of whether that development occurs in directly impacted wetlands. The mitigation measure is designed to address indirect impacts, and the checklist states that the subdivision map will implement the mitigation measure that includes on-site habitat restoration for indirect impacts on the harvest mouse "following an approved habitat mitigation and monitoring plan." Plaintiffs have not challenged this aspect of the checklist, and at oral argument the

17

City represented that it would implement in good faith the mitigation measure it has proposed for such indirect impacts.

The only aspect of the subdivision map that appellants identify which the REIR did not already address is the fact that the western sides of the raised and filled developed areas will be armored with riprap. The City contends the need for engineering and armoring of the slopes of the filled and raised developed areas has long been known and cites to a portion of the REIR that discusses different techniques the City could use to avoid settlement of fill. The portion of the REIR the City cites does not mention riprap. Also, the need for engineering and armoring slopes in connection with the subdivision map is to prevent erosion from waves and tidal flooding, not to prevent fill from settling as discussed in the REIR. The use of riprap in connection with erosion of the development is therefore new.

However, section 21166, subdivision (a) requires a subsequent or supplemental EIR only when "[*s*]*ubstantial* changes are proposed in the project which will require *major* revisions of the environmental impact report." (Italics added.) Because Government Code section 65457 incorporates section 21166 by reference, we take further guidance from the CEQA Guidelines' interpretation of section 21166. (*Building Industry Assn.*, *supra*, 62 Cal.4th at p. 381 [courts "should afford great weight to the Guidelines when interpreting CEQA, unless a provision is clearly unauthorized or erroneous under the statute"].) CEQA Guidelines section 15162, subdivision (a)(1) expands on the concept of project changes by stating that an

18

agency shall not conduct further review of a project unless "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects."  The same guideline also allows for further review if new information "of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete," shows "[m]itigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."  (CEQA Guidelines, § 15162, subd. (a)(3)(D).)

The new use of riprap does not meet this standard. Plaintiffs admit the REIR already recognized that the specific plan would lead to rat predation on the harvest mouse and addressed it with a mitigation measure.  Plaintiffs nonetheless argue the use of riprap deserves further study because it will substantially increase the severity of rat predation.  They appear to believe that without the riprap, the rats would den further away from the harvest mouse's habitat, so that the increased proximity will increase the severity of rat predation relative to the specific plan.  Plaintiffs cite nothing to support this belief. Logic might dictate that proximity will increase the risk of predation to some degree, but without some evidence to support

19

their contention, appellants cannot establish that there will be a substantial increase in the severity of conditions analyzed in the REIR. (*Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency*, *supra*, 6 Cal.App.5th at p. 1247 [party challenging a decision under section 21166 has the burden to demonstrate the decision is not supported by substantial evidence].) In the absence of such evidence, the City's position that its mitigation measure will continue to reduce the impact of rat predation as described in the REIR is supported by substantial evidence.

Plaintiffs counter the City's reliance on its predator management plan by pointing out that the plan does not require extermination or elimination of rats and that extermination or elimination of rats in riprap would be difficult. But even if the plan were revised to require eliminating rats through some means, such an adjustment would still not constitute a major revision to the REIR. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 175 & fn. 23 [change to small portion of project would not require a major revision to EIR when considered relative to the size of the rest of the project].) Any way we view it, the newly identified use of riprap does not trigger the section 21166, subdivision (a) exception to the Government Code section 65457 exemption.

We recognize that by rejecting appellants' arguments regarding the riprap, we are allowing the City's development to proceed despite a potential increase in the impact on the harvest mouse to some degree. However, Government Code section

65457 compels this result by setting a higher threshold for review of a residential development consistent with a previously analyzed specific plan than for a project tiered under a program EIR. (See *Friends*, *supra*, 1 Cal.5th at p. 960 [review of project tiered under a program EIR is "more searching" than review for substantial changes or new circumstances].) "The [Government Code] section 65457 exemption, like other statutory exemptions, reflects the Legislature's determination that the interest promoted is 'important enough to justify forgoing the benefits of environmental review.'" (*Dublin*, *supra*, 214 Cal.App.4th at p. 1312.) The interest animating Government Code section 65457 is to increase the supply of housing. (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1324, 1331 [discussing history of Gov. Code, § 65457 and its similar predecessor statute, former Gov. Code, § 65453].) Thus, Government Code section 65457 is intended to permit housing developments like the one at issue here that are consistent with a specific plan that has already undergone environmental review, "regardless of possible environmental impacts of the project." (*Dublin*, at p. 1312.)

## III. Changed circumstances and new information

Plaintiffs' arguments concerning the changed circumstances and new information exceptions present a variation on their argument about the impact of changes to the project on the harvest mouse's upland habitat. The new information and circumstances they point to are scientific insights concerning the amount and rate of sea level rise that emerged after the City certified the REIR. Plaintiffs concede that

21

the City was not required to review the effects of sea level rise on the project.  (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 472–474 (*Ballona Wetlands*) [agency was not required to analyze impacts of sea level rise on project].)  In an amicus brief, Environmental Defense Center, Sierra Club, San Francisco Baykeeper, and The Ohlone Audubon Society (collectively, "amici") characterize such analysis of the effects of sea level rise on a project as "reverse-CEQA," because CEQA requires analysis of a project's impact on the environment and not the environment's impact on a project.  Plaintiffs and the amici argue the City was nonetheless required to examine whether the project risks exacerbating the effects of sea level rise on the environment because of how the project interacts with wetlands in the area.  They rely on the California Supreme Court's clarification in *Building Industry Association*, *supra*, 62 Cal.4th at page 377, that "when a proposed project risks exacerbating those environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users."  They argue that study of how the project will exacerbate the harms of sea level rise is not "reverse-CEQA" but rather classic CEQA prospective analysis of how a project will affect the existing environmental conditions and risks at the site.

　　This argument turns on the concept of wetland migration, which appellants define as "the movement of wetland areas inland to slightly higher areas as sea levels rise and the former wetlands are gradually submerged."  According to appellants and

22

the amici, the subdivision map's development of all the uplands in subareas B and C will prevent the wetlands in those areas from migrating. They contend this process, which the amici call "coastal squeeze," will effectively eliminate wetlands in the area, as rising sea levels inundate the wetlands on one side and on the other side the project's elevated building sites hem them in and prevent the wetlands from becoming established on higher ground. In their reply brief, appellants connect this idea to their arguments about predation and the loss of escape habitat. They argue that rising sea levels will force the harvest mouse from its wetland habitat into the developed residential areas instead of into escape habitat, causing the harvest mouse to suffer predation from rats in the riprap and other threats from dogs, cats, people, and cars.

Plaintiffs and the amici may be right that under *Building Industry Association* an EIR must analyze the risk that a project could exacerbate the effects of sea level rise by contributing to coastal squeeze and thwarting wetland migration. Even if they are correct, however, these dynamics are not new in relation to this project, so the City did not need to address them in the checklist. Plaintiffs themselves cite to a mention of wetland migration in an appendix to the City's first EIR for the specific plan in 2009, long before the City certified the REIR. Additionally, as noted above, the REIR assumed the entire development areas in Area 4 (Sub-Areas B, C, and D) would be developed and impacted, which would lead to the destruction of 154.6 acres of uplands. The time and place for appellants' and

23

amici's argument regarding the effects of the development of uplands and rising sea levels on wetland migration was in response to the City's circulation of the REIR, if not the original EIR.

Plaintiffs' arguments about new scientific studies showing an increased rate of sea level rise do not convince us otherwise. The REIR noted that the rate of sea level rise was uncertain and might be accelerating, so the REIR anticipated the new information that appellants rely on. More importantly, while the increased rate of sea level rise might *expedite* the effects of thwarted wetland migration and make it harder to mitigate those effects, the overall impact on the wetlands is the same: Wetlands will be lost because the specific plan did not provide for any mitigation of thwarted wetland migration, so it is immaterial for CEQA purposes that sea level rise may occur faster and make such mitigation more difficult. Accordingly, sea level rise does not make the impacts of thwarted wetland migration substantially more severe in a way that would trigger the section 21166 exception to the Government Code section 65457 exemption. (CEQA Guidelines, § 15162, subd. (a)(3)(A) & (B)[7].)

_____

[7] "When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following: . . . [¶] (3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

24

## IV.     Adaptive management

In a separate argument, appellants take issue with a hydrology report attached to the checklist, which says the City would take an adaptive approach to managing flooding of the project from sea-level rise toward the end of the century, such as by creating levees or floodwalls built on top of or outside the raised and filled residential areas.  In their opening brief, they fault the City for using this approach because it improperly defers consideration of mitigation measures for the project's impacts, since the City did not say whether any of the adaptive mitigation measures would be effective at addressing flooding, nor did it address whether and how to avoid the environmental impacts the measures would create.

This argument regarding mitigation measures is misplaced.  Sea level rise is not an impact on the environment caused by the project, so neither the REIR nor the checklist needed to discuss the effects of sea level rise on the project at all.[8] (*Building Industry Assn.*, *supra*, 62 Cal.4th at p. 377; *Ballona Wetlands*, *supra*, 201 Cal.App.4th at pp. 472–474.)  For the same reason, the adaptive responses to sea level rise discussed in the hydrology report are not mitigation measures and not governed by the rules concerning deferred mitigation.  (*King & Gardiner*

___

[¶] (A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [or] [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR."  (CEQA Guidelines, § 15162, subd. (a)(3)(A) & (B).)

[8] The City apparently chose to include the discussion in accordance with a policy in its general plan.

25

*Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 851 ["Mitigation is defined as an action that minimizes, reduces, or avoids a significant environmental impact or that rectifies or compensates for the impact"].)

In their reply brief, appellants change tack and argue instead that "[e]ven if the adaptive pathways do not constitute mitigation measures under CEQA, they would certainly be considered as a future project that is directly linked to the 2019 project." Plaintiffs then contend that with faster rates of sea level rise that will result in higher overall levels, additional flood protection measures should be viewed as a reasonably foreseeable project, not just a hypothetical.

Because appellants raised this alternative theory for the first time in their reply brief, we need not consider it. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 707.) In any event, it fares no better. The hydrology report discussed the use of adaptive responses to sea level rise in the latter part of the century, between 2070 and 2100. The hydrology report cites 2018 projections for sea level rise by 2100 that range from 2.4 feet at the low end to 10.2 feet in the most extreme scenario. The projections for 2100 that appellants cite range from 0.3 meters (about 1 foot) in the best-case scenario to 2.5 meters (8.2 feet) in a worst-case scenario.

The City's potential responses to environmental conditions between 50 and 80 years from now cannot be considered part of the current project. Additionally, the range of projections for sea levels by that time are wide and sea levels at different ends of

26

those projections could warrant significantly different responses. Because the City currently can only dimly guess what measures will be needed to respond to conditions several generations from now, the City was not required to analyze the impacts of the adaptive pathways as part of this project.  (*Environmental Council of Sacramento v. County of Sacramento* (2020) 45 Cal.App.5th 1020, 1031 ["CEQA does not require an EIR to discuss future developments which are unspecified or uncertain. 'Such an analysis would be based on speculation about future environmental impact' "].)

## DISPOSITION

The judgment is affirmed.

BROWN, J.

WE CONCUR:

STREETER, ACTING P. J.
ROSS, J.[*]

*Citizens Committee v. City of Newark* (A162045)

---

[*] Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/25/22

**CERTIFIED FOR PUBLICATION**
**CALIFORNIA COURT OF APPEAL**
**FIRST APPELLATE DISTRICT**
**DIVISION FOUR**


CITIZENS' COMMITTEE TO COMPLETE THE REFUGE et al.,
    Plaintiffs and Appellants,
v.
CITY OF NEWARK et al.,
    Defendants and Respondents;

SI XVII, LLC, et al.,
    Real Parties in Interest and Respondents.

A162045
Alameda County
Sup. Ct. No. RG19046938


BY THE COURT:

The written opinion which was filed on December 29, 2021, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.


Date:_____    _____Acting P.J.
                                     J. Streeter

1

Trial Court:        Alameda County Superior Court

Trial Judge:        Hon. Frank Roesch

Counsel:            Law Offices of Stuart M. Flashman, Stuart M. Flashman;
                    John Buse, Lisa Belenky for Plaintiffs and Appellants.

                    Linda Krop, Margaret Hall as Amicus Curiae on behalf of
                    Plaintiffs and Appellants.

                    Rutan & Tucker, David P. Lanferman, Matthew D.
                    Francios, Travis Van Ligten for Defendants and
                    Respondents.

                    Cox, Castle & Nicholson, Andrew B. Sabey, Anne E.
                    Mudge, Linda C. Klein, Craig E. Spencer for Real Parties in
                    Interest.