Filed 6/13/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| GREGORY LUCAS, | B310777 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCP05618) |
| v. | |
| CITY OF POMONA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Channel Law Group, Julian K. Quattlebaum III and Jamie T. Hall for Plaintiff and Appellant.

Best Best & Krieger, Alisha M. Winterswyk and Ali V. Tehrani for Defendant and Respondent.

————————————

The City of Pomona (the City) decided to allow commercial cannabis activities in specific locales within its boundaries. In doing so, the City determined it was exempt from the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[1] (CEQA) and the Guidelines adopted to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines). Thus, when the City chose areas to locate commercial cannabis activities, it did not conduct additional environmental review under CEQA.

Appellant Gregory Lucas (Lucas) wanted his storefront property included among the locales where commercial cannabis activity would be allowed. The City, however, excluded Lucas's property. Lucas then filed a petition for writ of mandate to overturn the City's designation of areas for permissible commercial cannabis activities. He contended the City made the decision improperly by foregoing further environmental review. The superior court denied the petition and entered judgment in favor of the City.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Legalization of Cannabis Use*

On November 8, 2016, California voters approved Proposition 64, titled "Control, Regulate and Tax Adult Use of Marijuana Act," and enacted a state statutory scheme legalizing, controlling, and regulating the cultivation, manufacturing, distribution, and sale of nonmedical (adult-use or recreational)

---

[1] Undesignated statutory references are to the Public Resources Code.

cannabis and cannabis products for use by adults 21 years of age and older.  On June 27, 2017, Governor Jerry Brown signed Senate Bill No. 94 (2017–2018 Reg. Sess.), titled the "Medicinal and Adult-Use Cannabis Regulation and Safety Act."  Senate Bill No. 94 creates one state regulatory structure for medical and adult-use commercial cannabis activities and provides that a state license will not be approved for a business to engage in commercial cannabis activity if the business activity violates any local ordinance or regulation.  The Bureau of Cannabis Control, the California Department of Food and Agriculture, and the California Department of Public Health were charged with licensing and regulating commercial cannabis activities in California. They released regulations outlining licensing procedures for adult-use commercial cannabis and issued licenses for such activities commencing January 1, 2018.

II.     ***The City's General Plan, General Plan Update, and Environmental Impact Report***

By way of background, we digress because it is important to know about the City's General Plan, General Plan Update, and the Environmental Impact Report, upon which the City's cannabis regulations were superimposed.

State law requires that each city and county adopt a comprehensive General Plan.  (Gov. Code, § 65300.)  Because the General Plan is the constitution for all future development, any decision by a city affecting land use and development must be consistent with the General Plan.  The City's General Plan was developed in 1976.

The City's General Plan Update, developed in July 2013, is "intended to function as a policy document to guide land use decisions within the City's planning area."  It provides

3

"comprehensive land use, housing, circulation and infrastructure, public service, resource conservation and public safety policies for the entire City."

The purpose of an Environmental Impact Report (EIR) is to "[i]nform public agency decision-makers and the public generally of the significant environmental effects of a project, identify possible ways to minimize the significant effects, and describe reasonable alternatives to the project" in accordance with CEQA and its Guidelines. An EIR also identifies whether imposition of mitigation measures or specific alternatives to a project may reduce significant[2] or potentially significant environmental effects to less-than-significant[3] levels. Once an EIR has been prepared, "subsequent activities within the program must be evaluated to determine what, if any, additional CEQA documentation needs to be prepared."

The City's final EIR, certified in March 2014 (2014 EIR), evaluated possible environmental issues—pursuant to CEQA and its Guidelines—associated with the implementation of the General Plan Update for the development of the City through the year 2035, and identified its environmental impacts—including potential impacts to air quality, geology and soils, hazards and hazardous materials, scenery and aesthetics, hydrology and

---

[2] A "significant" effect is defined by Guidelines section 15382 as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, [and] ambient noise."

[3] An impact is considered "not significant" when it "may be adverse, but does not exceed the significance threshold levels and does not require mitigation measures."

water quality, land use and planning, noise, population and housing, public services, traffic, and greenhouse gas emissions. It also proposed feasible mitigation measures to reduce or eliminate potentially significant impacts or effects. The 2014 EIR and its appendices comprise 889 pages total.

III.    ***Ordinance Nos. 4254 and 4257***

On August 6, 2018, the City Council voted to place a cannabis business tax measure, Ordinance No. 4254 (Tax Ordinance) on the ballot for the November 6, 2018 general municipal election. The City's voters approved the Tax Ordinance, which established a tax on commercial cannabis activity within the City.

On April 1, 2019, the City adopted Ordinance No. 4257 (Business Ordinance), which established a formal application process to obtain a license to operate a commercial cannabis business within the City. The Business Ordinance provides that, in addition to complying with all other applicable zoning regulations and state and local permit requirements, no commercial cannabis permit is valid if the proposed commercial cannabis business is located within a 1,000-foot radius of a school providing instruction in kindergarten or any grades 1 through 12, a day care center, or a youth and recreation center, which is in lawful existence at the time a successful application is submitted to the City.

As a result of the adoption of the Tax and Business Ordinances, the Pomona Municipal Code was amended by adding chapter 68, "Commercial Cannabis Businesses," to regulate the cultivation, manufacturing, sale, delivery, and transportation of medicinal and adult-use cannabis and cannabis products in a responsible manner to protect the health, safety, and welfare of

City residents, neighborhoods, and businesses from disproportionately negative impacts and to enforce rules and regulations consistent with state law.

## IV. *Ordinance No. 4273 – Commercial Cannabis Permit Program Overlay District*

Before formally accepting applications for its Commercial Cannabis Permit Program, the City had to designate locations where cannabis-related land uses would be permitted. This action of designating specific parcels within the City where cannabis businesses could operate in compliance with certain ordinances was "brought forth as an 'overlay' within the Pomona Zoning Ordinance." An "overlay district" provides additional land use regulation beyond the "underlying" zone that already exists on the parcel.

The City's proposed Ordinance No. 4273 establishes a Commercial Cannabis Permit Program Overlay District (Overlay District) in the City. The Overlay District was further divided into four subareas in the City where cannabis-related uses would be allowed and grouped by zoning designations and cannabis use permits. The City planned to award up to eight commercial cannabis permits. We refer to Ordinance No. 4273 and the Overlay District it establishes as the Project[4].

---

[4] A "project" is an activity that 1) is undertaken or funded by or subject to the approval of a public agency and 2) may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. (§ 21065; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1180 (*Union*).)

6

To establish the Overlay District for commercial cannabis land use activity, the City, through its City Staff, conducted a multistep analysis that included studying the scientific basis of cannabis as it relates to potential land use impacts, understanding existing state, federal, and industry regulations, identifying and verifying sensitive uses, conducting a parcel-level analysis, considering community feedback, and studying potential environmental impacts.

As the first step in developing the Overlay District, City Staff identified all parcels in the City that would remain eligible for inclusion after buffering out sensitive uses (for example, the 1,000-foot buffer established by the Business Ordinance between any retail commercial cannabis business and any public or private K-12 school, day care center, or youth and recreation center). As part of developing the Business Ordinance, the City created a list of sensitive uses in June 2018, which established a Sensitive Use Buffer Map. The remaining eligible parcels were next grouped into Cannabis Permit Areas, based on similar zoning, land use, and geographical features, and were field investigated by City Staff.

City Staff analyzed the potential environmental impacts of cannabis-related land uses. City Staff conducted field trips to six legally operating cannabis businesses in cities similar to the City in terms of size and demographics. City Staff also met with planning staff from various cities with existing commercial cannabis permit programs, including Los Angeles (L.A.) and Long Beach, to obtain information on the day-to-day operations of various types of cannabis businesses. City Staff met with the L.A. County Sanitation District and L.A. County Fire Department to understand how cannabis uses are similar or

distinct from other types of industries with respect to environmental impacts. City Staff met with three agencies regulating cannabis in California to understand licensing requirements, operational requirements for cultivation and manufacturing, and inspection/enforcement. City Staff met with the City's police department to better understand enforcement against illegal dispensaries and heard directly from officers about specific challenges related to cannabis enforcement in the City.

On May 1, 2019, at a joint meeting of the City Council and City Planning Commission (Planning Commission), City Staff released a draft map to the general public as a starting point to discuss and further develop a draft Project. Throughout the year 2019, City Staff held a series of community meetings to answer questions and address concerns related to the development of the Project; concerns raised were incorporated into its analysis. Lucas's address/area was identified as a storefront location on the draft map and was initially included within the proposed Overlay District.

On August 28, 2019, City Staff presented a draft map at a Planning Commission meeting and an Open House at the City Council. Based on comments received, many revisions were made to the Overly District draft map.

V.  *Determinations of Similarity*

Based on research, interviews, and field visits, a total of six types of commercial cannabis permits were identified based on their typical land use activity:

1) "Storefront Retail" is a commercial permit type issued by the Bureau of Cannabis Control. Storefront retail operations are brick-and-mortar retail establishments that sell packaged cannabis products. Customers must be over 21 years old. "This

8

permit type is similar in land use activity to other convenience retail uses, such as drug stores."

2) "Manufacturing" is a commercial cannabis permit type issued by the California Department of Public Health. Manufacturing refers to the extraction of cannabinoids and terpenes from the cannabis plant for use in the production of various cannabis products. "This permit type is similar in land use activity to other manufacturing uses, such as the extraction of essential oils or food and beverage production."

3) "Cultivation" is a commercial cannabis permit type issued by the California Department of Food and Agriculture's CalCannabis Division. The Business Ordinance does not permit outdoor cultivation of any type. Indoor cultivation requires artificial lighting to conduct indoor agricultural raising of the cannabis plant. CalCannabis currently permits up to 22,000 square feet of indoor cultivation. "This permit type is similar in land use activity to other crop raising uses, such as large nurseries."

4) "Testing" is a commercial cannabis permit type issued by the Bureau of Cannabis Control. All cannabis products for sale in the State of California must pass laboratory testing conducted by a permitted cannabis testing facility. "This permit type is similar in land use activity to other processing uses, such as medical imaging and testing labs or scientific research facilities."

5) "Distribution" is a commercial cannabis permit type issued by the Bureau of Cannabis Control. Cannabis products cannot be transported from one facility to another in California without a license. Distribution licenses include General Distribution for brick-and-mortar facilities that stock cannabis

items, and Distributor–Transport for transportation between licensed facilities.

6) "Microbusiness" is a commercial cannabis permit type issued by the Bureau of Cannabis Control. To qualify, an operator must conduct three of the following four activities: storefront retail, distribution, indoor cultivation up to 10,000 square feet, or nonvolatile manufacturing. Such operations basically sell product grown or manufactured on site in microbusiness storefronts.

Based on the entirety of its research into commercial cannabis permit types and their associated land use activities, City Staff determined that the six proposed land uses related to commercial cannabis are similar enough to existing and defined land uses within the Pomona Zoning Ordinance and the General Plan Update or were so defined using a Determination of Similarity (DOS) process. The DOS process applies to any land use in the City that is not specifically listed in the zoning ordinance.

On October 9, 2019, City Staff approved the six DOS findings. That is to say, the City determined the six proposed cannabis uses are *consistent with and similar to already existing land uses*. As such, they would be required to meet all state, county, and local regulations, including but not limited to zoning standards, construction codes, fire codes and other City codes applicable to and governing similar businesses before cannabis-related uses could be established within the City.

The six commercial cannabis uses determined to be similar to existing business practices are: 1) cannabis cultivation is a use similar to raising of crops; 2) cannabis distribution is a use similar to distributing plants; 3) cannabis manufacturing is a use similar to manufacturing, compounding, processing, or packaging

10

of products; 4) cannabis retail is similar to retail stores; 5) cannabis retail storefronts are similar to retail storefronts; and 6) cannabis lab testing is similar to laboratory testing. The six DOS findings also provide, as relevant to this appeal, that the proposed cannabis use is not of greater intensity or density than similar uses and would not generate more environmental impacts.

The six DOS findings also state that the findings "shall be final unless an appeal is made within ten (10) days after the decision." Nothing in the record indicates that Lucas or any other member of the public initiated any appeal of the DOS findings within 10 days of October 9, 2019.

VI. ***Findings of Consistency***

In addition to its own investigation and research, the City hired an expert environmental planning firm, Rincon Consultants, Inc., to prepare the necessary CEQA analysis for the Project, known as Findings of Consistency.

In October 2019, Rincon Consultants circulated its Findings of Consistency, which evaluated the Project's consistency with the findings of the 2014 EIR prepared for the General Plan Update to determine whether the Project would have new or increased significant environmental effects beyond those identified in the 2014 EIR.

Permitted land uses in the Project would be subject to the development standards set forth in the existing base zoning district (e.g., commercial zones) or base specific plan(s) (e.g., the General Plan Update). Pursuant to Guidelines section 15183, subdivision (a)—"Projects Consistent with a Community Plan, General Plan Update, or Zoning"—additional environmental review is not required for projects "which are consistent with the

11

development density established by existing zoning, community plan, or general plan policies for which an EIR was certified," except as might be necessary to determine whether there are project-specific significant effects.

The four established subareas in the City "were designated upon consideration of existing sensitive uses identified in the City . . . as well as land use analysis." Parcels not identified within a sensitive use buffer were "further analyzed against a methodology which included consistency with the [General Plan Update] land use designation, site accessibility, incompatible land uses, and existence of legal non-conforming residential uses."

The Findings of Consistency included a table that identified permitted uses and how they fall into existing, defined land use classifications in the City based on the Pomona Zoning Ordinance, the General Plan Update, and the six DOS:

| Commercial Cannabis Permit Type | Land Use Classification(s) |
|---|---|
| Manufacturing | Manufacturing |
| Indoor Cultivation | Raise Crops |
| Outdoor Cultivation | N/A[5] |
| Distribution | Manufacturing |
| Testing | Processing |
| Microbusiness | Manufacturing, Commercial, Raise Crops |
| Retailer-Storefront | Convenience Use, Retail Store |

---

[5] Outdoor cultivation of cannabis would not be permitted in any of the four designated subareas.

The Findings of Consistency addressed each of the environmental issues studied in the 2014 EIR for the General Plan Update, comparing the effects of the proposed Project to the effects of the adopted General Plan Update.

A.   **Air Quality**

The proposed Project would not cause growth beyond that accommodated by the General Plan Update or result in an impact to the Air Quality Management Plan beyond that identified in the 2014 EIR.

Forecasted development under the General Plan Update would generate temporary construction and long-term operational air pollutant emissions (e.g., vehicle trips and stationary sources), including potential increases in carbon monoxide (CO) odors and concentrations.  The 2014 EIR had concluded that adherence to applicable General Plan policies and South Coast Air Quality Management District's (SCAQMD) regulations would reduce potential air pollutant emissions on a site-specific basis to a less-than-significant level.  The 2014 EIR had further determined that future development, per the General Plan Update, would not result in traffic congestion at intersections that would create objectionable odors or exceed CO standards that may affect a substantial number of people.

Implementation of the Project would not allow development of greater intensity than is allowed under the General Plan Update and, as such, would not result in air pollutant emissions or CO concentrations beyond those forecasted in the General Plan Update.  As regulated by Pomona Municipal Code section 68-27, odor control devices and techniques—such as carbon filters and air systems—are required in all commercial cannabis businesses to ensure that odors from cannabis are not detectable off-site.

The proposed Project would not result in air quality impacts from construction or operation emissions beyond those identified in the 2014 EIR.

### B.     <u>**Greenhouse Gas Emissions**</u>

Cannabis-related development in the Project would remain subject to development standards set forth in the existing base zoning district and the General Plan Update and would occur within designated subareas currently consisting of other retail, commercial, or industrial uses.  As with other uses that could be developed in the Project subareas, cannabis-related development would result in greenhouse gas emissions and a demand for energy, particularly from indoor cultivation.  As regulated by Pomona Municipal Code section 68-30, cannabis cultivation is required to comply with state and local laws related to electricity, water usage, water quality, discharges, and similar matters. Cannabis-related development would be subject to regulations aimed at achieving statewide greenhouse gas emission reduction targets, including the 2030 target of a 40 percent reduction from emission levels outlined in Senate Bill No. 32 (2021–2022 Reg. Sess.).  Permitted uses in the Project are also required to comply with energy conservation measures in the California Green Building Standards Code and 2019 Building Energy Efficiency Standards, which include measures that increase building performance so that new development does not result in wasteful, inefficient, or unnecessary consumption of energy.  The proposed Project would not result in an impact related to greenhouse gas emissions or energy consumption beyond that identified in the 2014 EIR.

14

## C.     **Land Use and Planning**

The Project would not introduce new land use designations or otherwise alter the general land use patterns or development standards; rather, it would establish locations in the City that permit land uses related to commercial cannabis, which would remain subject to the development standards set forth in the existing base zoning district or the General Plan Update. Implementation of the Project would not conflict with existing land use designations or physically divide an established community.  It would not generate growth that would exceed growth forecasts, impacting the Air Quality Management Plan. Thus, the proposed Project would not involve consistency conflicts with land use plans, policies, or regulations not identified in the 2014 EIR.

## D.     **Noise**

Because permitted use in the Project would remain subject to existing development standards set forth in the base zoning district or the General Plan Update to which the Project is added, operational noise associated with such development would not differ from what was considered in the 2014 EIR. Implementation of the proposed Project would not result in temporary or operational noise impacts beyond those identified in the 2014 EIR.

## E.     **Public Services**

The 2014 EIR concluded that "development facilitated by the General Plan increase demand for police protection services and potentially create the need for new police protection facilities; however, compliance with applicable codes and regulations and compliance with General Plan Update policies

would reduce impacts to a less than significant level." Because permitted use in the Project areas would remain subject to existing development standards set forth in the base zoning district or the General Plan Update, impacts to police protection services would not differ from what was considered in the 2014 EIR. The proposed Project would not result in the need for additional police protection facilities. No impacts beyond those identified in the 2014 EIR would occur.

F. **Traffic**

Cannabis-related development would occur within designated subareas that currently consist of other retail, commercial, or industrial uses. Because permitted uses in the Project areas remain subject to existing development standards set forth in the base zoning district or General Plan Update to which the Project is added, and allowed development intensity would not increase, traffic impacts associated with such development would not differ from what was considered in the 2014 EIR. Cannabis-related development would also be required to meet all applicable local and state regulatory standards for site design and emergency access, including those in the California Building Code, Pomona Municipal Code, and Fire Code. Therefore, the Project would not generate traffic hazards or site accessibility issues and would have no impact beyond that identified in the 2014 EIR.

Operation of the commercial cannabis uses (i.e., cultivation, distribution, and retail) would not substantially change traffic patterns on area roadways and would not be expected to impact levels of service at any nearby intersections or induce a substantial increase in vehicle miles traveled when compared to existing uses in designated subareas. The Project would not

16

increase traffic impacts to the roadway network beyond those identified in the 2014 EIR since it would not increase development intensity compared to the General Plan Update.

G. **Conclusion**

The Findings of Consistency concluded that the Project "would not introduce new land use designations or otherwise alter general land use patterns or development standards." It found "integration of the proposed [Project] would not result in any new or increased severity of significant environmental effects beyond those identified in the 2014 EIR." Mitigation beyond that identified in the 2014 EIR is "not required for any of the analyzed environmental issue areas." It concluded that "no additional environmental review or documentation is required."

VII. *The City's Public Hearing Held October 9, 2019 and Lucas's Objections*

During a public hearing held October 9, 2019, the Planning Commission considered a recommendation to the City Council to approve the Project. The final draft did not include Lucas's storefront business property in the Overlay District.

The minutes of the public hearing identify Lucas as a longtime resident of the City and owner of property in the City, who "stated he was excited to be included in the overlay, because additional security would no longer make his property a soft target. He shared all the problems he has witnessed [in] the area over the last several years (murder, fires, stolen copper). He stated he doesn't understand why his property was taken off the overlay, because there aren't children or other pedestrians. . . . He stated it's an industrial and office area where cannabis should

17

be welcome.  He requested the Planning Commission reconsider including this area.”

The transcript of the October 9, 2019 proceedings sets out Lucas's stated position at the public hearing: “Originally I saw my area was included in the map and I thought that was a great thing for that area. . . . [¶] So I was pretty excited when I seen that we were included in that . . . .  We had a bunch of problems over the years. . . .  In 2015 my building burnt down.  In 2016 the Fairplex sign was caught on fire.  Then we had a small kitchen fire in 2014 and by the time they got there to do the repairs somebody had stole all the copper.  So we need some help there.  There's no residence in that area.  There's none whatsoever.  I don't understand why [my property has been] taken off the overlay.”  “I think in this area, this is an industrial office area, cannabis should be welcome.  There's no residents right there.  The security that has been a strength in the area, something that's paramount to somebody like me that has supported the City of Pomona for 26 years.  Allowing cannabis to operate in the area will bring us a level of security that we deserve and I just hope and pray that this Council will reconsider improving that area.”

Other parties opposed, for different reasons, the proposed commercial cannabis area boundaries.  The City of La Verne submitted a letter dated October 1, 2019, stating it “previously passed an ordinance which prohibits [cannabis-related] activity within [its] boundary.”  It requested that the City of Pomona “revise the map to consider [their] shared boundary as a sensitive use, with a 1,000 [foot] buffer from these shared jurisdictional lines.”

The City of Walnut, which does not permit cannabis-related activities and shares a border with Pomona, submitted a letter dated October 9, 2019, stating it is "formally objecting to the establishment of a Cannabis Permit Program Overlay District, as currently proposed." It contended the DOS "attempting to deem cannabis related activities (such as cultivation, distribution, retailing and manufacturing) consistent with Pomona's General Plan and 2014 [EIR]" was "questionable" and expressed "concern" that the "proper analysis required by [CEQA] has not been attempted." The letter provided that the proposed Overlay District boundaries are "literally adjacent" to the City of Walnut and "ignored how its proposal would impact the . . . proposed land uses and development in the City of Walnut."

At the October 9, 2019 public hearing, the City Council voted not to recommend approval of the Project. The matter was referred back to the Planning Commission for additional deliberation and revisions and to make changes to the proposed Project.

## VIII. *Post-October 9, 2019 Hearing Objections*

On October 11, 2019, Lucas sent an email to the City stating: "I saw when Pomona was approving my area for cannabis and I was excited. Finally we will have enough security and be important enough for regular police patrols. [¶] I have heard people say cannabis should not be approved [in my area] because kids walk home from school down that street. [¶] That is not true. I have owned 1740 Gillette Rd since 1993 [and] have never seen even one school kid walk by. All I see is the criminal element from . . . surrounding fields. [¶] . . . [¶] There is no residence on Gillette. The only people here are the homeless and criminals from . . . surrounding areas. . . . [¶] I was thinking of selling my

19

building and reinvesting in a safer area. Then I saw the first map draft and my area was on the block for a micro business so I changed my mind and decided [to] stay. . . . [¶] . . . So why was my area omitted? [¶] Allowing cannabis to operate in this area will bring a level [of] security . . . that is much needed and greatly desired. . . . [¶] I hope and pray you see the logic and the unlimited benefits of allowing this in my area. I am begging you [to] reconsider or correct the wrong. This is and will be one of the best areas in the whole City to allow cannabis."

In a letter dated October 29, 2019, the City of Claremont expressed "concern with the proposed area along Foothill Blvd which you are considering for the permitting of retail cannabis sales. This particular area . . . lies in the center of what we consider one of [the] most vulnerable communities." Claremont requested that "City Council consider the addition of a 1,000 foot buffer from neighboring City borders be added" to the Overlay District zones; Claremont posited "this buffer would preserve and protect our neighborhoods from any potential negative impacts."

In a letter dated October 29, 2019, the City of La Verne again requested that the City maintain a 1,000 foot buffer from its jurisdictional boundary.

The City of Walnut submitted a letter dated October 30, 2019, stating that the Walnut City Council "voted to formally oppose the Overlay District as presently proposed." Walnut City "strongly urge[d] the City of Pomona to eliminate the southernmost portion of Sub Area 3 along Valley [Blvd.] adjacent to the City of Walnut." The City of Walnut also objected to Pomona's reliance on Guidelines section 15183, subdivision (a) as improper, and argued the Findings of Consistency failed to adequately consider new and increased significant environmental

20

impacts posed by commercial cannabis uses. In addition, the City Manager of Walnut expressed concern that the City's determination that cannabis-related activities were consistent with the General Plan Update and 2014 EIR "raises substantial concern that the proper analysis required by [CEQA] has not been attempted."

In addition, other public commenters, including a school principal, lodged concerns about: increased traffic from residents of surrounding cities who would come to the City because cannabis is illegal in their cities; hazardous chemicals used in growing released in faulty water discharges; proximity of cannabis facilities to schools; increase in air pollution; noise from back-up generators to be used in case of power outages; odor from live plants; increase in crime and enforcement issues; and greenhouse gas emissions.

IX. ***The City's Hearings on November 4 and 18, 2019***

At the public hearing on November 4, 2019, the City Council introduced "for first reading" the ordinance to establish the permissible locales for commercial cannabis activities. The minutes of the meeting reflect that an amendment was introduced to the Project which included an additional 600-foot buffer from the City's boundaries. Also removed from the Project were 122 of the 414 parcels originally contemplated, leaving 292 parcels eligible for commercial cannabis activities. The City Council unanimously approved the ordinance, as amended.

On November 18, 2019, the City's development services director replied to Lucas's email and stated: "Thank you for inquiring about [your] parcel along Gillette Road and its removal from the Draft Commercial Cannabis Permit Program. I wanted to provide you with additional information on the methodology

21

that we used in removing these parcels. [¶] As part of our analysis into cannabis zoning, one step was to look at the parcel's General Plan '*land use designation*.'  This designation is a long-range vision for how the City intends to use the land, beyond existing zoning. . . .  In the case of the area along Gillette Road adjacent to the freeway, it is contemplated as 'Neighborhood Edge' and 'Activity Center.'  This would allow a combination of retail but also *multi-family residential uses*.  As residential uses may be problematic in this area, given their proximity to air quality emissions from the neighboring freeway, we believe this is one area of the city where the long-range vision needs to be revisited and possibly amended.  Therefore, rather than introduce a new land use such as cannabis in this area, we have paused on these parcels and removed them from consideration at this point in time, until we can revisit and clarify an appropriate long-range vision and land use designation for this area.  This same analysis also led to the removal of parcels along Second Street east of Reservoir, which have a long-term designation that posed various land use challenges that need to be revisited."

At the City Council meeting and public hearing held November 18, 2019, a "second reading" and discussion of the Project was held.  The City Council adopted as appropriate the DOS and found the Project, as amended, in compliance with CEQA, the Business and Tax Ordinances, and the General Plan Update.  It also found the Project reflects community feedback.  The meeting minutes specify that a few individuals "spoke on concerns" regarding the proposed cannabis locations or the cannabis application process.  The meeting minutes further specify that Lucas "spoke in opposition of" the Project.

The transcript of the November 18, 2019 public hearing

provides context as to what exactly Lucas "spoke in opposition of": The property Lucas owns has "always been zoned commercial ever since I bought it. . . . [¶] [On] May 6, 2019, Pomona issued a map outlining the proposed cannabis areas. . . . My area was identified as the only storefront location at that time. . . . [¶] Then in August was the first time I'd seen an overlay with any type of exclusion for [my] area." Lucas "reached out" to the City and was informed "that it was part of the general plan that possibly that area is going to be zoned residential in the future. I've owned that property for 26 years. That area will never be residential." "I was real excited when I saw the City of Pomona was finally going to get into the cannabis arena, especially after seeing Santa Ana had made 7.9 million dollars last fiscal year on taxes." Lucas "spen[t] two million dollars on a [commercial] building" in that area. "I stand to lose millions. You know, if the City takes a wrong path and discriminates against me, I don't think this is fair and my attorney does not think it's fair. Failure to do the right thing and approve the right area will not only cost me millions; it's going to cost the City of Pomona millions, too. So I hope and pray that this Council sees the error in the proposed map and the potential liability placed on the City before we even issue our first license and make a correction." Lucas did not object based on Guidelines section 15183, nor did he raise any environmental concerns.

Following City Council and City Staff discussion, a motion to adopt the Project was approved unanimously. The motion concluded the ordinance was exempt from CEQA and adopted the Findings of Consistency which asserted the Project met the strict streamlined review process and requirements in Guidelines section 15183 and concluded that no additional environmental

review or documentation was required. The City Council directed City Staff to file a Notice of Exemption outlining its CEQA determination.

On November 19, 2019, the Planning Commission filed a Notice of Exemption for the Project with the county recorder. The exempt status relied on Guidelines section 15183. It reasoned: "According to Section 15183 (Projects Consistent with a Community Plan or Zoning) of the CEQA Guidelines, additional environmental review is not required or projects 'which are consistent with the development density established by existing zoning, community plan, or general plan policies for which an EIR was certified.' Findings of Consistency with the 2014 [EIR] were prepared and approved by City Council."

## X.    *Petition for Writ of Mandate*

On December 24, 2019, Lucas filed a petition for writ of mandate (petition) against the City pursuant to Code of Civil Procedure section 1094.5. It alleged a single cause of action—a violation of CEQA. Lucas challenged the City's determination that the Project qualified for an exemption under Guidelines section 15183, subdivision (a), and argued the City's approval of the ordinance establishing the Project must be vacated and voided.

Lucas cited the Findings of Consistency and disagreed with its conclusion. He alleged the City "is one of the few jurisdictions in the area that allows the sale of commercial cannabis" and "the establishment of a limited number of locales in which commercial cannabis may be purchased will result in traffic and related air quality impacts that were not, and could not have been, analyzed in the 2014 EIR" because the City did not allow commercial cannabis activities at the time the 2014 EIR was prepared. He

24

alleged the impacts of this "newly permitted use" are not similar to the "impacts of the typical development contemplated" in the 2014 EIR. "Increased traffic from residents of many surrounding communities who will come to [the City] because cannabis is illegal in their communities is a specific impact that was not analyzed in the 2014 EIR."

Lucas also alleged the discussion of greenhouse gas emissions in the 2014 EIR and the Findings of Consistency "does not support the conclusion that there would be no significant project specific or site-specific [greenhouse gas emission]-related impacts." The Findings of Consistency also "failed to take into account . . . that there will be significant project-specific and site-specific noise impacts due to the fact that indoor cultivation . . . will require installation of back-up generators which will produce significantly greater noise than the uses studied in the 2014 EIR."

Lucas requested that the court order the City to vacate and set aside its approval of the Project, including all permits and the Notice of Exemption adopted by the City to facilitate the Project, because the City "failed to comply with the provisions set forth under [CEQA] and therefore failed to proceed in a manner required by law." Lucas also requested that the court order the City to "prepare and certify a legally adequate environmental review for the Project."

XI.    *The City's Answer*

On August 5, 2020, the City filed its answer to Lucas's petition for writ of mandate and denied improper adoption of exemption. The City asserted many affirmative defenses against Lucas, including, but not limited to, lack of standing under section 21177, failure to exhaust administrative remedies, claim

25

preclusion, failure to comply with CEQA, no prejudicial abuse of discretion, and legislative discretion.

## XII. *Hearing, Ruling, and Judgment*

The hearing on Lucas's petition to set aside the City's approval of the Project took place on November 24, 2020. The court admitted into evidence the nearly 12,200-page administrative record. After lengthy argument, the trial court denied Lucas's petition.

The trial court found the "facts establish that the [Project] excluding Lucas's property has an impact on his business opportunity" and thus he has "beneficial interest" standing to raise a CEQA challenge to the City's environmental analysis. The court next found Lucas did not have "public interest" standing. The court also found Lucas "exhausted his administrative remedies."

The trial court ruled the City was entitled to rely on Guidelines section 15183, subdivision (a) and that the Project is consistent with the General Plan and meets the foundational criterion of the exemption. The court found the six DOS findings were final and most of Lucas's issues stemmed from the City's decision to approve the DOS, which "*conclusively* determined that the [permitted] cannabis-related uses . . . are sufficiently similar to the uses allowed by the underlying zoning." (Italics added.)

In addition, the court found the substantial evidence standard applies to review of the City's section 21083.3 exemption. The court found substantial evidence that the Project "do[es] not alter general land use patterns because they fall within the uses permitted by the underlying zoning"; does not substantially impact air quality; and will not result in increased traffic, odor, noise, and greenhouse gas emission impacts beyond

26

those addressed by the 2014 EIR.

On December 15, 2020, the trial court entered judgment against Lucas.

## XIII. *Measure Ballot*[6]

Three weeks before the November 24, 2020 trial court hearing and resulting decision, the City Council placed two cannabis-related measures on the ballot for the general municipal election held on November 3, 2020: 1) Measure PO, which adopted a cannabis permit overlay identical to the Project; and 2) a competing ballot measure, Measure PM. Measure PO passed with 59.11 percent votes in favor to 40.89 percent against.

On December 7, 2020 (after the trial court issued its November 24, 2020 decision), the City deemed Measure PO adopted and ratified pursuant to City Resolution No. 2020-181.

On February 1, 2021, Lucas filed a notice of appeal from the December 15, 2020 judgment denying the petition for writ of mandate. He did not file an appeal from or obtain a court-ordered stay as to the results of the November 3, 2020 election on

---

[6] On May 25, 2022, the City filed a motion requesting judicial notice of three documents: 1) the City's Resolution No. 2020-124, ordering the submission of Ballot Measure PO to affirm the Project Ordinance and Business Ordinance at the general election held on November 3, 2020; 2) the City's Resolution No. 2020-181, ratifying and adopting Measure PO after the results of the November 3, 2020 election; and 3) the City Council's report dated December 7, 2020 regarding the official election results of the November 3, 2020 election. We grant the request for judicial notice. (Cal. Rules of Court, rule 8.252; Evid. Code, §§ 452, subd. (b), 459; see also Evid. Code, § 200 ["public entity" defined to include a city].)

Measure PO or the December 7, 2020 City Resolution No. 2020-181 adopting and ratifying Measure PO.

## DISCUSSION

Many issues are raised on appeal. The City argues Lucas lacks standing to maintain his writ petition, which, it also contends, is moot. The City also argues Lucas is precluded from proceeding because he failed to exhaust administrative remedies. We assume Lucas prevails on these procedural issues and proceed to the merits of the appeal: whether the City's determination that the Project is exempt per section 21083.3 and/or Guidelines section 15183 was proper and whether additional environmental review is needed.

## I. *CEQA, Generally*

CEQA and its Guidelines embody California's strong public policy of protecting the environment. (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 428–429 (*Arcadians*).) CEQA was enacted to advance four related purposes: to 1) inform the government and public about a proposed activity's potential environmental impacts; 2) identify ways to reduce, or avoid, environmental damage; 3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and 4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment. (*Arcadians,* at pp. 428–429.)

CEQA provides a three-tiered process to guide agencies in carrying out or approving a project which may have a significant effect upon the environment. (*Arcadians*, *supra*, 88 Cal.App.5th at p. 429.)

The first tier is jurisdictional, requiring the agency to conduct a preliminary review to determine whether the proposed activity is subject to CEQA. (*Arcadians*, *supra*, 88 Cal.App.5th at p. 429; *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636.) CEQA applies if the proposed activity is a "project" under the statutory definition, unless the project falls within one of several exemptions to CEQA. (See §§ 21065, 21080.) If the agency finds the project is exempt from CEQA under any of the stated exemptions,[7] an agency's CEQA inquiry ends and the agency may proceed to file a notice of exemption, citing the relevant section of the Guidelines and including a brief statement of reasons to support the finding. (Guidelines, § 15062; *Arcadians*, at p. 429; *San Francisco Beautiful v. City and County of San Francisco*

---

[7] The agency must decide whether the activity qualifies for:

1) A *statutory exemption*, enacted by Legislature (see § 21080, subd. (b); *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 850 (*North Coast*); *Union*, *supra*, 7 Cal.5th at p. 1186); or

2) One of the 33 *categorical exemptions* articulated in the Guidelines (see Guidelines, §§ 15300–15333 [listing 33 classes of projects categorically exempt from CEQA]).

A critical difference between statutory and categorical exemptions is that statutory exemptions are absolute, which is to say that the exemption applies if the project fits within its terms. (*North Coast*, *supra*, 227 Cal.App.4th at p. 850.) Categorical exemptions, on the other hand, are subject to exceptions that defeat the use of the exemption, and the agency considers the possible application of an exception in the exemption determination. (*Ibid.*)

(2014) 226 Cal.App.4th 1012, 1019–1020 (*San Francisco*).) If, however, the project does not fall within an exemption, the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792; *Union*, *supra*, 7 Cal.5th at p. 1186; see Guidelines, § 15063.)

One exemption under Guidelines section 15183, subdivision (a), does not require additional environmental review for projects "which are consistent with the development density established by existing zoning, community plan, or general plan policies for which an EIR was certified," except as might be necessary to determine whether there are project-specific significant effects. Guidelines section 15183 was promulgated on the authority of section 21083.3, which provides a public agency need examine only those environmental effects that are peculiar to the project and were not addressed or were insufficiently analyzed as significant effects in the prior EIR. (§ 21083.3, subds. (a), (b).)

The second tier of the CEQA process requires the agency to conduct an initial study to determine whether the project may have a significant effect on the environment. (*Arcadians*, *supra*, 88 Cal.App.5th at p. 429; Guidelines, § 15063.) If the initial study finds no substantial evidence that the project may have a significant effect, the agency is excused from preparing an EIR, and instead, must prepare a negative declaration, briefly describing the reasons supporting the determination; environmental review ends. (*Arcadians*, at p. 430; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390; Guidelines, §§ 15063, subd. (b)(2), 15070.) If the initial study identifies potentially significant environmental effects but 1) those effects can be fully

30

mitigated by changes in the project, and 2) the project applicant agrees to incorporate those changes, then the agency must prepare a mitigated negative declaration. (*Arcadians*, at p. 430.)

Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact that cannot be mitigated—and thus, the project does not qualify for a negative declaration—then the third tier of the CEQA process is reached. (*San Francisco*, *supra*, 226 Cal.App.4th at p. 1020; §§ 21100, 21151; Guidelines, §§ 15063, subd. (b)(1), 15080.) The agency must prepare and certify an EIR on the proposed project before approving or proceeding with the project. (*Union*, *supra*, 7 Cal.5th at p. 1187.) The EIR is the "heart" of CEQA, providing agencies with in-depth review of projects with potentially significant environmental effects. (*Laurel Heights Improvement Assn. v. Regents of the University of California* (1993) 6 Cal.4th 1112, 1123; *Pacific Palisades Residents Association, Inc. v. City of Los Angeles* (2023) 88 Cal.App.5th 1338, 1363.)

The CEQA requirements apply to discretionary projects carried out or approved by public agencies, including enacting and amending zoning ordinances, issuance of conditional use permits, and approving tentative subdivision maps (§ 21080), but "[m]inisterial projects proposed to be carried out or approved by public agencies" and those the agency rejects or disapproves are expressly exempted from CEQA. (*Id.*, subd. (b)(1) & (5).) Keeping these principles in mind, we turn to the merits.

II.   ***The City Properly Determined that the Project is Exempt per Guidelines Section 15183 and Requires No Additional Environmental Review***

Guidelines section 15183's parallel provision in CEQA is section 21083.3. (See generally, Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) pp. 511–517.) We discuss Guidelines section 15183 instead of the statutory provision because that is the way the parties primarily presented their arguments to this court.

A.   **Guidelines Section 15183, Generally**

Guidelines are "binding on all public agencies in California." (Guidelines, § 15000.) "In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 240, fn. 3.)

Section 15183 of the Guidelines is a statutory provision, not a categorical exemption—i.e., it is not among those exemptions set forth in Guidelines sections 15300 through 15333. Guidelines section 15183 provides that exempt classes of projects include, but are not limited to, qualifying projects "consistent with the development density established by existing zoning, community plan, or general plan policies for which an EIR was certified," as was the case here. (Guidelines, § 15183, subd. (a).) Such projects "shall not require additional environmental review, except as might be necessary to examine whether there are project-specific significant effects which are peculiar to the project or its site." (*Ibid.;* see also *id.* § 15183.3, subd. (d)(2)(A).) "This streamlines

the review of such projects and reduces the need to prepare repetitive environmental studies." (*Id.*, § 15183, subd. (a); see also *id.* § 15183.3, subd. (c).)

In approving a project meeting the requirements of Guidelines section 15183, a public agency shall limit its examination of environmental effects/impacts to those which the agency, in its initial study or other analysis, determines: 1) are peculiar to the project or the parcel on which the project would be located; 2) were not analyzed as significant effects in a prior EIR on the zoning action, general plan or community plan with which the project is consistent; 3) are potentially significant (whether off-site or cumulative) and were not discussed in the prior EIR prepared for the general plan, community plan or zoning action; or 4) are determined to have a more severe adverse impact than discussed in the prior EIR. (Guidelines, § 15183, subd. (b)(1)–(4); see also § 21083.3.)

B. **Standard of Review**

One dispute between the parties concerns the applicable standard of review in evaluating an exemption claimed under Guidelines section 15183.

Lucas contends the fair argument standard applies to the question of whether the claimed exemption obviated the requirement for an EIR. (See *Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 370 ["This unusual 'fair argument' standard of review over a public agency's decision has been characterized as setting a 'low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted.' "].) The standard presents a legal question, i.e., the sufficiency of the

evidence to support a fair argument; under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary.  (*Ibid*.)

The City, however, contends we should employ the substantial evidence standard of review in determining whether the Project is statutorily exempt from CEQA.

As explained below, we agree with the City.

Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*); *North Coast, supra,* 227 Cal.App.4th at p. 849.)  In considering a petition for writ of mandate in a CEQA case, our task on appeal is the same as the trial court's; we examine the City's decision.  (*San Francisco, supra,* 226 Cal.App.4th at p. 1021; *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257.)

Judicial review of the City's compliance with CEQA is governed by the prejudicial abuse of discretion standard set forth in section 21168.5.  Such an abuse "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (§ 21168.5; see *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512; see *Vineyard, supra,* 40 Cal.4th at pp. 426–427; see *Arcadians, supra,* 88 Cal.App.5th at p.428; see also *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 (*Gentry*).)  Therefore, we resolve the CEQA issues before us by independently determining whether the administrative record demonstrates any legal error by the City and whether it contains

substantial evidence to support the City's factual determinations. (*North Coast*, *supra*, 227 Cal.App.4th at pp. 849–850; *Sierra Club*, at p. 512 [whether the public agency employed the correct procedures and followed applicable law is subject to independent judicial review; whether the public agency made findings of fact supported by substantial evidence (or not)].) Also, when the agency acts in its role as the finder of facts, its findings are subject to deferential review under the substantial evidence standard. (*Sierra Club*, at p. 512.)

An agency's finding that a statutory exemption applies to a project will be upheld if substantial evidence supports the finding of exemption. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311.) In determining whether an agency's findings concerning the use of a statutory exemption from CEQA may be upheld, we review the administrative record to see that substantial evidence supports each element of the exemption. (*North Coast*, *supra*, 227 Cal.App.4th at p. 850.) There must be substantial evidence that the project is properly within an exempt status; that evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold. (*Ibid*.) Our application of substantial evidence review in the context of a challenge to an agency's use of a statutory exemption means we determine whether the administrative record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. (*Id*. at p. 851.) All conflicts in the evidence are resolved in support of the agency's action and we indulge all reasonable inferences to support the agency's findings, if possible. (*Ibid*.; *Chico Advocates for a Responsible Economy v. City of Chino* (2019) 40 Cal.App.5th 839, 845.)

Lucas's reliance on *Gentry*—for the notion that the fair argument standard applies—is misplaced. The court in *Gentry* found the party challenging *the adoption of the negative declaration* has the burden of proving there is substantial evidence supporting a fair argument of significant environmental effects. (*Gentry, supra,* 36 Cal.App.4th at p. 1379.) *Gentry* involved proceedings reviewing a city's adoption of a *negative declaration* and approval of a residential development project. (*Ibid.*) The *Gentry* decision did not hold that the fair argument standard applies to our review of a city's adoption of a notice of exemption finding no additional CEQA review is required because the Project would not result in significant environmental impacts or mitigation beyond those identified in the 2014 EIR.

The matter before us involves Lucas's writ petition challenging the City's November 19, 2019 Notice of Exemption determining that the Project qualifies for an exemption per Guidelines section 15183. Because Guidelines section 15183 requires an agency to examine whether a project's environmental effects were analyzed as significant impacts in a prior EIR on a general plan or zoning action with which the project is consistent (here, the 2014 EIR on the General Plan Update), the substantial evidence standard applies. "[F]air argument is not the proper standard of review. Substantial evidence is the proper standard where . . . an agency determines that a project consistent with a prior program EIR presents no significant, unstudied adverse effect." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 174; see, e.g., *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 611 ["the fair argument standard does not apply to review of an

36

agency's determination that a project's potential environmental impacts were adequately analyzed in a prior program EIR"].)

C.  **Analysis**

At the first tier, we determine whether the proposed activity is subject to CEQA. A "project" is an activity that 1) is undertaken or funded by or subject to the approval of a public agency, and 2) may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. (§ 21065; *Union, supra*, 7 Cal.5th at p. 1180.) The creation of the Overlay District qualifies as a project, as it was an activity undertaken by and subject to the City's approval, that may cause reasonably foreseeable environmental effects.

Lucas argues the Project does not fall within any exemption, and that the Project's significant environmental impacts were not adequately addressed in the 2014 EIR based on the General Plan Update, requiring further environmental review.

However, we agree with the City that the Project falls within one of several statutory exemptions to CEQA—Guidelines section 15183—and thus, did not require additional environmental review, warranting the City's issuance of the Notice of Exemption.

We address in detail below.

1.  **Guidelines Section 15183 Exemption Applies to the Project**

For the exemption under Guideline section 15183 to apply, the Project must be "consistent with the development density established by existing zoning, community plan, or general plan

policies for which an EIR was certified." (Guidelines, § 15183, subd. (a).) "Consistent" is defined as "the density of the proposed project is the same or less than the standard expressed for the involved parcel in the general plan, community plan or zoning action for which an EIR has been certified, and that the project complies with the density-related standards contained in that plan or zoning." (*Id.* § 15183, subd. (i)(2).)

Thus, Guidelines section 15183, subdivision (a) requires the Project to be "consistent with the development density established by existing zoning, community plan, or general plan policies"—here, the Pomona Municipal Code, Pomona Zoning Ordinance, California Building Code, the City's General Plan Update, and the certified 2014 EIR. Any environmental impacts associated with the Project would be similar to those anticipated in the General Plan Update and 2014 EIR, taking into consideration applicable municipal code and zoning requirements. No additional CEQA environmental review shall be required so long as the Project would not result in any new or increased significant environmental impacts or mitigation beyond those identified in the 2014 EIR based on the General Plan Update.

Lucas argues Guidelines section 15183 does not apply to exempt the Project because it was not consistent with the development density established by existing zoning or general plan policies for which the 2014 EIR was certified. (See Guidelines, § 15183, subds. (a), (d)(1)(B)–(C), (i)(2); Gov. Code, § 65860, subd. (a) ["zoning ordinances shall be consistent with the general plan"].) More specifically, Lucas contends, "Where there are no density-related standards contained in the zoning applicable to the parcels to which the Project relates, there is no

way for the Project to be deemed 'consistent.' "  He focuses on the fact that the "word 'density' does not even appear anywhere else in the entire Findings of Consistency."  Lucas argues the Findings of Consistency do not constitute "substantial evidence for the adopted [f]inding or the conclusion by the City that the exemption applied . . . to the Project."

Lucas's Appellate counsel Gregory T. Wittmann filed a declaration on March 30, 2022, stating to this court that he "reviewed the City of Pomona Zoning Code and City Code for density regulations applicable to non-residential uses" and "declare[s] that there are no provisions in the Pomona Municipal Code or Zoning Code which use the term 'density' specifically with reference to non-residential zones."

Lucas takes quite a literal approach—one with which we do not agree.  The fact that the exact word "density" or exact phrase "density-related standards" is not included in the zoning ordinances, General Plan Update, and 2014 EIR does not necessarily mean that those topics were not discussed with different verbiage.  Plus, a review of the administrative record shows "land use distribution and density" and "zone density/intensity" are, in fact, discussed in the 2014 EIR.  Furthermore, the DOS expressly provide that the six proposed commercial cannabis uses share "characteristics common with, and not of greater intensity, density or generate more environmental impact, than those uses listed in the land use district in which it is to be located."

And, as already discussed in a preceding section, Lucas did not file an appeal of the DOS conclusions.  They are now final.  The DOS determined that each of the six types of commercial cannabis uses/permits was deemed "similar" to other land use

activities. For instance, cannabis retail permit type was deemed "similar" in density and/or land use activity "to other convenience retail uses, such as drug stores." Cannabis manufacturing permit type was deemed "similar in land use activity to other manufacturing uses, such as the extraction of essential oils or food and beverage production." Cannabis cultivation permit type was deemed "similar in land use activity to other crop raising uses, such as large nurseries." Testing permit type was deemed "similar in land use activity to other processing uses, such as medical imaging and testing labs or scientific research facilities." Cannabis distribution permit type was found similar to land use activity of distributing plants. Microbusiness is a permit type similar to many land use classifications, such as manufacturing, commercial, and raising of crops.

Lucas is now foreclosed from challenging any of the foregoing commercial cannabis activities/land findings. Moreover, the Findings of Consistency adopted the City's conclusions made in the DOS, as the Findings of Consistency included a table that identified the six commercial cannabis permitted uses and how they fall into existing, defined land use classifications in the City based on the Pomona Zoning Ordinance, the General Plan Update, and the DOS. All of this, taken together, constitutes substantial evidence.

Substantial evidence shows the Project's proposed commercial cannabis activities were similar to or "consistent" with existing land uses or development density established by the 2014 EIR and General Plan Update, and thus meet the statutory exemption per Guidelines section 15183.

## 2. No Additional Environmental Review Necessary

Lucas again first takes a literal approach, arguing the 2014 EIR "does not include either the word 'marijuana' or the word 'cannabis,'" so how could the EIR have possibly addressed the significant environmental impacts related to cannabis use activities.  Lucas also argues the Findings of Consistency are "patently erroneous" for claiming the proposed Project "would not . . . alter general land use patterns" because the Project "establishes permissible locations *for a land use that has never before existed legally within the City."* (Italics added.)  His arguments miss the point.  The City determined via the six DOS that the proposed cannabis uses are not of greater intensity or density, nor would they generate more environmental impacts, than those listed in the land use district in which it is to be located.  This is a nonissue, given that the six commercial cannabis activities were deemed similar to already existing land uses, and as such, were covered by the uses contemplated by the 2014 EIR and 2013 General Plan Update.

Lucas next contends, based on Guidelines section 15183, subdivision (b), the City's decision that the Project is exempt from additional environmental review is not supported by substantial evidence.  Lucas argues the 2014 EIR did not address the Project's "unique and peculiar impacts associated with cannabis-related businesses."

The City argues the Project merely imposes an overlay use on existing zoning; it does not guarantee anyone the automatic right to establish a cannabis-related business, but rather, provides the option to apply for a cannabis business permit.  In that sense, the Project does not cause project-specific effects

"peculiar" to it.  Put differently, the Project does not cause effects dissimilar from effects caused by existing businesses.

We agree.

Resolving all conflicts in the evidence in support of the City and indulging all reasonable inferences to support the City's findings, we find substantial evidence—the General Plan Update, the 2014 EIR, the Project, the DOS, and Findings of Consistency—shows the Project "has no project-specific effects" that are "peculiar" to it.  An examination of the record shows there would not be reasonably foreseeable project-specific changes that were significant and peculiar to the Project, any amendments to applicable zoning, or to the Overlay District map.

The DOS specifically undertook this analysis and concluded—based "on the entirety of its research into commercial cannabis permit types and their associated land use activities"— that cannabis uses were sufficiently similar to existing uses allowed by the underlying zoning.  This research and effort spent constitute substantial evidence supporting the City's determination that commercial cannabis-related uses within the Overlay District do not alter the general land use patterns because they fall within the uses permitted by the underlying zoning.

### 3. **Impacts**

Lucas next argues the Project's impacts were "not analyzed as significant effects" in the 2014 EIR, and as such, are not exempt from further environmental review.  According to Lucas, many of the Project's environmental impacts were found to be less-than-significant effects in the 2014 EIR and not exempt from environmental review, including traffic, air quality, greenhouse gas emissions, land use/planning, noise, and public services.

We address each environmental impact below.

### a.     <u>Traffic</u>

Lucas argues "there is no evidence in the [r]ecord that the City made any finding, based on substantial evidence, that the policies or standards, when applied to future projects, would substantially mitigate the impact" on traffic. Lucas also argues the Project will generate increased vehicle traffic causing more vehicle emissions.

The Project would not increase traffic impacts to the roadway network beyond those identified in the 2014 EIR since it would not increase development intensity compared to the General Plan Update.

The 2014 EIR acknowledged that traffic impacts were significant and unavoidable, and adopted two mitigation measures. To mitigate the impact, the General Plan Update was amended to include a policy to "work with future developers to implement the [specific] improvements identified" in the 2014 EIR. Impacts were less than significant and no mitigation measures required; but it was "recommended" to consider "measures [that] could include radar speed limit signs, bulb outs, chicanes, or raised crosswalks." Cannabis-related development would also be required to meet all applicable local and state regulatory standards for site design and emergency access, including those in the California Building Code, Pomona Municipal Code, and Fire Code. Therefore, substantial evidence shows the Project would not generate traffic hazards or site accessibility issues and would have no impact beyond that identified in the 2014 EIR.

b.     Air Quality

Lucas argues there is no substantial evidence in the record to support the Findings of Consistency that the Project's impacts to air quality would be less than significant per the 2014 EIR.  He raises air quality impacts via the possibility of "odors [being] released due to faulty ventilation systems" which "cause release of unpleasant odors."

We disagree with Lucas and find there is substantial evidence showing any environmental impact on air quality by the Project is less than significant per the 2014 EIR.

Individual development projects facilitated by the General Plan Update would generate construction-related emissions, which may result in "temporary adverse impacts to local air quality."  However, these emissions can be mitigated on a specific development basis and impacts would be less than significant.

The 2014 EIR found mitigation measures are not required because "existing regulations, policies in the General Plan Update . . . and mitigation on a specific development basis would address potential impacts."  Similarly, implementation of the Project would not allow development of greater intensity than is allowed under the General Plan Update and, as such, would not result in air pollutant emissions or CO concentrations beyond those forecasted in the General Plan Update.  While outdoor cultivation of cannabis is not permitted, cannabis cultivation and manufacturing facilities can be a source of odor even if operations are completely indoors.  As regulated by Pomona Municipal Code section 68-27, odor control devices and techniques—such as carbon filters and air systems—are required in all commercial cannabis businesses to ensure that odors from cannabis are not detectable off-site.  The foregoing constitutes substantial evidence

44

that the Project would not result in air quality impacts from construction or operation emissions beyond those identified in the 2014 EIR.

c.    Greenhouse Gas Emissions

Lucas argues the primary source of greenhouse gas emissions related to cannabis cultivation is energy usage for lighting, heating, ventilating, and air conditioning.  He contends "these standards are not tailored to the extraordinary impacts that cannabis related business" have on such emissions.

The 2014 EIR provides the General Plan Update would encourage compact development; promote the establishment and practice of alternative transit (such as walking and biking) as a mode of transportation; increase use of renewable energy resources; and reduce per capita energy consumption, which will contribute to long-term reductions in per capita greenhouse gas emissions, in accordance with Senate Bill No. 375 (2007–2008 Reg. Sess.).  The 2014 EIR concluded that the increase in per capita greenhouse gas emissions under the General Plan Update would be less than significant.

Cannabis-related development in the Project would remain subject to development standards set forth in the existing base zoning district and the General Plan Update and would occur within designated subareas currently consisting of other retail, commercial, or industrial uses.  As with other uses that could be developed in the Overlay District subareas, cannabis-related development would result in greenhouse gas emissions and a demand in energy, particularly from indoor cultivation.  Thus, substantial evidence supports the finding that the Project would not result in any significant impact related to such emissions beyond that identified in the 2014 EIR.

45

### d.    Land Use and Planning

Lucas next argues the Findings of Consistency's conclusion of "no new land use impacts was not based on substantial evidence." He contends it is "glaringly erroneous" that the Project "would not . . . alter the general land use patterns" as it is establishing "an entirely new land use (one only legalized in the last few years)."

We disagree with Lucas again and find substantial evidence supports the Project's less-than-significant impact on land use/planning as contemplated by the 2014 EIR.

The 2014 EIR concluded that implementation of the General Plan Update would be consistent with applicable regionally adopted land use plans, policies, and regulations are applicable to development in the City. "Minor policy changes are recommended to address any potential inconsistencies."

The Project would not introduce new land use designations or otherwise alter the general land use patterns or development standards; rather, it would establish locations in the City that permit land uses related to commercial cannabis, which would remain subject to the existing development standards set forth in the existing base zoning district (e.g., Commercial Zones) General Plan Update. The Project would not involve consistency conflicts with land use plans, policies, or regulations not identified in the 2014 EIR.

Because permitted use in the Overlay District would remain subject to existing development standards set forth in the base zoning district, impacts to police protection services would not differ from what was considered in the 2014 EIR.

e.    <u>Noise</u>

Lucas argues there is "no substantial evidence in the record to support the claim" of no significant impacts on noise.  For instance, Lucas argues there is "nothing in the record to establish that the noise created by back-up generators required at cannabis businesses by the City would be consistent with the sources of noise addressed in the EIR."  Lucas argues the "operational noise" associated with cannabis business are unique noise impacts specific to the Project.

Lucas's arguments fail.

The 2014 EIR provides that implementation of the City's existing noise regulations and standards, as well as goals and policies of the General Plan Update, "would generate or expose persons to ambient noise levels in excess of standards established in the local general plan or noise ordinance."  Goals and policies contained in the General Plan Update, as well as development standards and regulations would minimize these impacts, which were classified as "*less than significant.*"  Additionally, implementation of the General Plan Update "could expose noise-sensitive receptors to substantial temporary or periodic ambient noise increases.  However, these impacts would be temporary, limited in their geographic scope, regulated by the [Pomona Municipal Code], and in some cases reduced by policies of the proposed General Plan Update."  Impacts were classified as "*less than significant.*"  In fact, the only noise impacts classified as "*significant but mitigable*" requiring mitigation measures were the construction and operation of projects near rail lines and airports, not commercial cannabis activities and/or land uses.  In addition, Pomona Municipal Code section 18-305 regulates and

47

allows noise sources associated with construction, repair, remodeling or grading of *any* real property.

Because permitted use in the Overlay District would remain subject to existing development standards set forth in the base zoning district or plan to which the Project is added, operational noise associated with such development (i.e., back-up generators) would not differ from what was considered in the 2014 EIR. Surely back-up generators are also utilized by other retail stores or manufacturers in times of a power outage. The foregoing constitutes substantial evidence the implementation of the proposed Project would not result in temporary or operational noise impacts beyond those identified in the 2014 EIR.

### f. Public Services

Lucas contends substantial evidence does not support the City's determination that the Project's impact on police services would not differ from what was considered in the 2014 EIR. We disagree.

The 2014 EIR concluded that development facilitated by the General Plan Update would increase the City's population and density of development, and would increase demand for police protection services, and potentially create the need for new police facilities. The City "is considering several options for new police facilities, most of which involve conversion of existing uses." Impacts would be "*less than significant*" as the General Plan policies "would address potential impacts." In addition, compliance with applicable codes, regulations, and with General Plan Update policies would reduce impacts to a less-than-significant level.

Because permitted use in the Overlay District would remain subject to existing development standards set forth in the

48

base zoning district or base plan, impacts to police protection services would not differ from what was considered in the 2014 EIR. The Project would not result in the need for additional police protection facilities. No impacts beyond those identified in the 2014 EIR would occur.

There are no peculiar, project-specific characteristics that make the previous analysis inadequate, and, based on Guidelines section 15183, the proposed Project's environmental impacts require no further study. However, additional study was indeed performed to determine if there would be project-specific measures that could further reduce the level of impact.

The City justifiably relied on the exemption provided in Guidelines section 15183.

## DISPOSITION

The judgment in favor of the City is affirmed. The City shall recover its costs on appeal.

## CERTIFIED FOR PUBLICATION

STRATTON, P. J.

We concur:

GRIMES, J.                    WILEY, J.